United States Court of Appeals,

Fifth Circuit.

No. 92-7529.

MAGNOLIA BAR ASSOCIATION, INC., et al., Plaintiffs-Appellants,

v.

Roy Noble LEE, et al., Defendants-Appellees.

July 9, 1993.

Appeal from the United States District Court for the Southern District of Mississippi.

Before POLITZ, Chief Judge, KING, and DUHÉ, Circuit Judges.

KING, Circuit Judge:

The plaintiffs in this case filed suit against various officials of the State of Mississippi, alleging that Mississippi's current method of electing supreme court judges violates section 2 et seq. of the Voting Rights Act of 1965, 42 U.S.C. § 1973 et seq. The district court rejected the plaintiffs' section 2 claim and dismissed their complaint. The plaintiffs now appeal. For the following reasons, we affirm the decision of the district court.

## I. BACKGROUND

The Mississippi Supreme Court is the state's court of last resort in both criminal and civil matters. It currently consists of nine judges who are selected for eight year terms in partisan elections. Vacancies are filled by the Governor, with special elections held for the unexpired term. Candidates for the Mississippi Supreme Court must meet age, residency, and professional qualifications, which are set forth in the Mississippi Constitution. *See* MISS. CONST. art. VI, § 150.

The state of Mississippi is divided into three east-west districts for purposes of electing supreme court judges. That is, three judges are elected from the Northern District, the Central District, and the Southern District of the state. In each of the three east-west districts, then, Mississippi Supreme Court judges are chosen in at-large, partisan elections.

On August 17, 1990, the Magnolia Bar Association, the Mississippi State Conference of the NAACP, the Rainbow Coalition, the Mississippi Association of Black Supervisors, the Mississippi

Conference of Black Mayors, and four black citizens and registered voters of Mississippi (collectively, "Plaintiffs"), filed suit against various state officials (collectively, "Defendants"). The Plaintiffs alleged, among other things, that Mississippi's method of electing supreme court judges violates section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973.[1] As a remedy, the Plaintiffs sought single-member election districts, or in the alternative, an election scheme using limited or cumulative voting.

The Plaintiffs' section 2 claim proceeded to trial on February 25, 1992. During trial, the Plaintiffs advanced several theories of section 2 liability. First, they presented evidence designed to challenge the current multimember election districts—i.e., evidence suggesting that the multimember election districts, as currently drawn, dilute black voting strength. They also levelled a "vote fragmentation" challenge to the current election scheme, arguing that the current east-west district lines impermissibly fracture black voting strength, which is concentrated in the western segment of Mississippi. Finally, the Plaintiffs offered evidence designed to prove a "hybrid" line-drawing/multimember section 2 claim. Specifically, they presented evidence designed to show that Mississippi's multimember districting scheme, when combined with the east-west districting lines, operates to cancel out or minimize black voting strength.

The district court rejected each of the theories of section 2 liability advanced by the Plaintiffs. *See Magnolia Bar Ass'n v. Lee,* 793 F.Supp. 1386 (S.D.Miss.1992). With regard to the Plaintiffs' straightforward challenge to the current multimember election districts, the court first determined that, in the Northern and Southern Districts, the Plaintiffs had failed to adduce evidence sufficient to satisfy the first threshold requirement of *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) (i.e., they failed to demonstrate that blacks would constitute a majority of the voting age population in any of the proposed single member districts). *See* 793 F.Supp. at 1401-02. The court also concluded that, in the Central District, the Plaintiffs had failed to satisfy the third

---

[1]The Plaintiffs also asserted claims under section 5 of the Voting Rights Act, under the Fourteenth and Fifteenth Amendments to the United States Constitution, and under Mississippi law. On September 24, 1991, a three-judge panel granted the Defendants' motion for partial summary judgment on the Plaintiffs' section 5 claim. And, by pre-trial order, the Plaintiffs voluntarily dismissed all claims except their section 2 claim.

*Gingles* threshold requirement (i.e., they failed to demonstrate a pattern of legally significant white bloc voting). *See* 793 F.Supp. at 1405-07. As for the Plaintiffs' straightforward vote fragmentation claim, the district court determined that it also failed on the first *Gingles* threshold requirement. The district court specifically concluded that, even if north-south districts were drawn, blacks would not constitute a majority of the voting age population in any of the three proposed multimember districts. *See* 793 F.Supp. at 1414-15. Finally, with respect to the Plaintiffs' hybrid challenge, the district court determined that, although the Plaintiffs had satisfied the *Gingles* threshold requirements, their claim failed under the totality of the circumstances inquiry. *See* 793 F.Supp. at 1415-18.

Ultimately, the district court concluded that the Plaintiffs "failed to prove by a preponderance of the evidence any violation of section 2 of the Voting Rights Act of 1965." 793 F.Supp. at 1418. The district court accordingly entered judgment in favor of the Defendants and dismissed the case. The Plaintiffs now appeal.

## II. GOVERNING LEGAL PRINCIPLES

A. The Section 2 Framework

Section 2 of the Voting Rights Act of 1965, as amended, prohibits states and political subdivisions from employing any "voting qualification or prerequisite to voting or standard, practice, or procedure ... in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). Section 2 further provides that

> A violation ... is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [a protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 1973(b). Finally, section 2 instructs that, although courts should consider "the extent to which members of a protected class have been elected to office in the State or political subdivision," the protected class has no "right to have members .. elected in numbers equal to their proportion in the population." *Id.*

It is settled in this circuit that section 2 claims must be analyzed under a two-part framework.

To prevail on such a claim, a class of minority voters must first satisfy certain threshold requirements set forth by the Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Minority voters must then offer evidence of the circumstances of the local political landscape—many of which Congress specifically listed in the 1982 amendments to section 2 as being relevant to the inquiry. Ultimately, the *Gingles* threshold inquiry and the broad, totality of circumstances inquiry are designed to probe whether the challenged election practice "has resulted in the denial or abridgement of the right to vote based on color or race." *Chisom v. Roemer,* --- U.S. ----, ----, 111 S.Ct. 2354, 2363, 115 L.Ed.2d 348 (1991).

1. *The Gingles Threshold Inquiry*

The *Gingles* threshold inquiry, which was first formulated in the context of a challenge to a multimember election scheme, is a relatively narrow one. To satisfy it, the minority group must prove by a preponderance of evidence that (1) it is sufficiently large and geographically compact to constitute a majority in a single member district, (2) its members are politically cohesive, and (3) the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances—usually to defeat the minority group's preferred candidate. *Gingles,* 478 U.S. at 48-51, 106 S.Ct. at 2765-67. Failure to establish any one of the *Gingles* factors precludes a section 2 violation, because "[t]hese circumstances are necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice." *Id.* at 50, 106 S.Ct. at 2766.

Although formulated in the context of a challenge to a multimember election scheme, the *Gingles* threshold inquiry also applies to other types of section 2 claims. In *Growe v. Emison,* --- U.S. ----, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993), a unanimous Supreme Court held that the minority plaintiffs, who were alleging that single-member district lines, as currently drawn, fragmented their voting strength, had to satisfy all three of the *Gingles* threshold requirements. And, in *Voinovich v. Quilter,* --- U.S. ----, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993), a case in which the plaintiffs alleged that the existing district lines diluted minority influence over elections, the Supreme Court reiterated that the *Gingles* threshold factors have relevance not only to challenges to

multimember districting schemes, but also to other types of section 2 challenges. Writing for a unanimous Court, Justice O'Connor stated:

> Of course, the *Gingles* factors cannot be applied mechanically and without regard to the nature of the claim. For example, the first *Gingles* precondition, the requirement that the group be sufficiently large to constitute a majority in a single district, would have to be modified or eliminated when analyzing the influence-dilution claim we assume *arguendo* to be actionable today. The complaint in such a case is not that black voters have been deprived of the ability to constitute a *majority,* but of the possibility of being a sufficiently large *minority* to elect their candidate of choice with the assistance of cross-over votes from the white majority.

*Id.* at ----, 113 S.Ct. at 1157.

2. *The Totality of Circumstances Inquiry*

Once the minority group satisfies the *Gingles* threshold inquiry, it must then offer evidence of the circumstances of the local political landscape—evidence demonstrating that "its members have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice." 42 U.S.C. § 1973(b). In the Senate Report accompanying the 1982 amendments to section 2, Congress listed several factors that will typically be relevant to the totality of circumstances inquiry. *See* S.REP. No. 417, 97th Cong., 2d Sess., at 28-29, (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206-07. These include:

a. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

b. the extent to which voting in the elections of the state or political subdivision is racially polarized;

c. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

d. whether members of the minority group have been denied access to [any candidate slating] process;

e. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

f. whether political campaigns have been characterized by overt or subtle racial appeals; [and]

g. the extent to which members of the minority group have been elected to public office in the

jurisdiction.

*Id.* at 28-29, 1982 U.S.C.A.A.N. at 206-07 (footnotes omitted).  In the same report, Congress also listed two "[a]dditional factors that in some cases have had probative value ... to establish a violation."  *Id.* at 29, 1982 U.S.C.A.A.N. at 207.  They are:

> h. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;  [and]

> i. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 29, 1982 U.S.C.A.A.N. at 207.  Finally, Congress noted that, "[w]hile these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged dilution."  *Id.,* 1982 U.S.C.A.A.N. at 207.

Ultimately, a district court can find a section 2 violation only if, "in the particular situation, the [challenged] practice operate[s] to deny the minority plaintiff[s] an equal opportunity to participate [in the political process] and to elect candidates of their choice."  *Id.* at 30, 1982 U.S.C.A.A.N. at 207.  The Senate Report instructs courts not to become bogged down in "mechanical "point counting'," *id.* at 29 n. 118, 1982 U.S.C.A.A.N. at 207 n. 118, but rather, to make a "searching practical evaluation of the [locality's] "past and present reality,' " *id.* at 30, 1982 U.S.C.A.A.N. at 208.  "[T]here is no requirement that any particular number of [the Senate] factors be proved, or that a majority of them point one way or another."  *Id.* at 29, 1982 U.S.C.A.A.N. at 207.

B. Standard of Appellate Review

Because a district court's findings in a section 2 case are "peculiarly dependent upon the facts of each case" and require "an int ensely local appraisal of the design and impact of the contested electoral mechanisms," we review those findings under the clearly erroneous standard of review.  *See Gingles,* 478 U.S. at 79, 106 S.Ct. at 2781.  If the district court applies the correct legal standards, we will not set aside its findings under the *Gingles* threshold inquiry, the totality of circumstances inquiry, and the ultimate vote dilution inquiry unless we are "left with the definite and firm conviction that a mistake has been committed."  *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105

S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). That is, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety," its findings will not be reversed. *Id.* at 573-74, 105 S.Ct. at 1511-12.

## III. ANALYSIS

The outcome of this appeal turns on the district court's application of the *Gingles* threshold requirements. As explained below, the district court did not clearly err in finding that the Plaintiffs failed to demonstrate legally significant white bloc voting in supreme court elections in the Mississippi Central District. Nor did the district court clearly err in finding that, if the district lines were drawn from north to south rather than from east to west, blacks would not constitute a majority of the voting age population in any of the hypothetical multimember districts. These two findings under the *Gingles* threshold inquiry effectively foreclose the Plaintiffs' straightforward challenges to the current multimember districts and the current district lines, as well as the Plaintiffs' hybrid line-drawing/multimember challenge. Accordingly, we do not reach the Plaintiffs' arguments with respect to the district court's findings under the totality of circumstances inquiry.[2]

A. The Straightforward Multimember District Challenge

The district court first rejected the Plaintiffs' straightforward challenge to Mississippi's current

---

[2]In particular, we do not reach the Plaintiffs' arguments that (a) the district court erred in failing to discuss relevant contrary evidence on three critical factors under the totality of circumstances inquiry; (b) the district court erred in finding that "the extent to which black citizens fail to exercise their obligation to vote diminishes the weight to be given the history of official discrimination," 793 F.Supp. at 1408; (c) the district court erred when, considering minority electoral success, he took into account the "considerable electoral success ... [which was, in part,] attributable to the Voting Rights Act and the Mississippi litigation under it," 793 F.Supp. at 1410; (d) the district court erred in finding that the state policies for maintaining the current east-west, multimember districts are not tenuous; and (e) the district court erred in concluding that the state policies for maintaining the present district lines foreclose the Plaintiffs' section 2 challenges. Of course, by refusing to reach these arguments, we do not mean to express our approval of the particular actions and conclusions about which the Plaintiffs complain.

In this regard, we also deny the Plaintiffs' motion requesting us to take judicial notice of the fact that the Mississippi legislature has enacted a law which establishes an intermediate appellate court. This request was made in connection with the Plaintiffs' argument that the district court erred in assessing the weight of the state interests underlying the current electoral system. Because we are not addressing this argument, there is no need to take judicial notice of a statute which possibly calls into question the strength of Mississippi's interest in the current electoral scheme.

multimember districting scheme. With respect the Northern and Southern Districts of Mississippi, the district court determined that the Plaintiffs could not satisfy the first *Gingles* threshold factor. That is, they could not draw a single-member district in either of these areas in which blacks would constitute a majority of the voting age population. And, with respect to the Central District, the district court found that, although the Plaintiffs satisfied the first two *Gingles* threshold factors, they could not satisfy the third *Gingles* factor—legally significant white bloc voting. In making this finding, the district court relied primarily on the fact that the only two blacks who had run for the Mississippi Supreme Court in the Central District, Judge Anderson in 1986 and Judge Banks in 1991, defeated their white opponents with significant support from white voters. *See* 793 F.Supp. at 1405-1407.

The Plaintiffs argue on appeal that the district court clearly erred in finding no legally significant white bloc voting in the Central District. They argue specifically that the district court clearly erred in finding "that the election of Anderson and the election of Banks to the Mississippi Supreme Court were not aberrational but evidence that whites will not necessarily vote as a bloc for white candidates having black opponents in Mississippi Supreme Court elections so as to "usually defeat the minority's preferred candidate.' " 793 F.Supp. at 1407 (quoting, *Gingles,* 478 U.S. at 51, 106 S.Ct. at 2767). They contend that the only evidence that the election of these two black judges was *not* aberrational is the testimony of the Defendants' expert witness, who they contend was not qualified to render such an opinion. The Plaintiffs point instead to the testimony of their expert, Dr. Lichtman, who stated that (a) white bloc voting in the Central District is legally significant and (b) the election of the two black candidates, who were both incumbents, was aberrational. They reason that, based on his uncontradicted testimony and the evidence of racially divergent voting patterns in other elections,[3] the district court was required to find legally significant white bloc voting in the

---

[3]Dr. Lichtman analyzed three different kinds of election contests pitting black candidates against white candidates: judicial elections throughout the state of Mississippi (including Circuit, Chancery, and Supreme Court elections); elections in the Second Congressional District; and numerous city and county elections. His analyses covered approximately a twenty year period and included a wide range of local state, and federal offices. His conclusions were based on these studies.

Central District. We disagree.

The Plaintiffs have not offered any authority, and we can find none, for their assertion that the district court may only rely on expert conclusions in det ermining whether white bloc voting is legally significant or whether elections in which whites do not vote as a bloc are aberrational. Indeed, it seems entirely reasonable to permit the district court to examine the election results offered by both sides, as well as the circumstances surrounding those elections, and det ermine for itself—with or without expert conclusions as to which elections are aberrational—whether the white majority votes sufficiently as a bloc so as to *usually* defeat the minority-preferred candidate. The Plaintiffs' argument that the district court was required to accept their expert's conclusion that the election of two black judges to the Mississippi Supreme Court was aberrational is, therefore, without merit.

Although a close call, we t hink that the district court could reasonably conclude that the election of two black judges from the Central District was not aberrational, but rather, probative evidence that whites would not vote as a bloc so as to usually defeat the preferred supreme court candidate of black voters. Judge Anderson, the black candidate who defeated a known white segregationist in 1986, received 58% of the white vote. Judge Banks, who narrowly defeated a well-known, white chancery judge in 1991, received approximately 30% of the white vote and virtually unanimous support from blacks. Given this evidence, as well other evidence offered by the Defendants suggest ing that black and white voters do not generally prefer different candidates in Mississippi judicial elections, the district court's finding that the election of Anderson and Banks was not aberrational is plausible in light of the record. Therefore, it is not clearly erroneous.

We also reject the Plaintiffs' related argument that the election of Anderson and Banks had to be discounted because of their status as incumbents. We recognize that, in *Gingles,* the Supreme Court stated that incumbency may be a "special circumstance" that explains isolated minority success in a community polarized along racial lines. *See* 478 U.S. at 57, 106 S.Ct. at 2770. The problem with the Plaintiffs' argument is that the district court had valid reasons for not considering the incumbency of the black candidates as a "special circumstance." As already noted, both of the elections were high profile and involved well-known white candidates. Moreover, neither of the two

black candidates had been incumbents for very long. Anderson was appointed to the Mississippi Supreme Court in January 1985 and ran for reelection the next year. Banks had to run in a special election less than a year after he was appointed. Had we been sitting as trier of fact, we may well have reached a different conclusion about the weight to be given these two elections; however, it cannot be said that the district court clearly erred in refusing to discount the two Mississippi Supreme Court elections involving black candidates merely because those candidates were incumbents.

Accordingly, we hold that the district court did not clearly err in finding no legally significant white bloc voting in Mississippi Supreme Court elections in the Central District. This court has repeatedly stated that, when statistical evidence is used to establish legally significant white bloc voting, the most probative elections are generally those in which a minority candidate runs against a white candidate. *See, e.g., Westwego Citizens for Better Government v. City of Westwego,* 872 F.2d 1201, 1208 n. 7 (5th Cir.1989). It also follows that elections involving the particular office at issue will be more relevant than elections involving other offices. At the time of trial, there were only two supreme court elections in the Central District where a black candidate had opposed a white candidate, and in both of them, the black candidates, who were also the candidates preferred by black voters, received substantial support from white voters and won the elections. In light of this evidence, the district court could reasonably conclude that the Plaintiffs did not meet their burden of "demonstrat[ing] that the white majority votes sufficiently as a bloc to enable it ... *usually* to defeat the minority's preferred candidate." *Gingles,* 478 U.S. at 51, 106 S.Ct. at 2767 (emphasis added).

B. The Straightforward Line-Drawing or Vote Fragmentation Challenge

The district court also rejected the Plaintiffs' straightforward vote fragmentation challenge. It noted that, even if district lines were drawn so as to create three north-south multimember districts, the Plaintiffs would not be able to satisfy the first *Gingles* threshold factor. The district court specifically determined that blacks would not constitute a majority of the voting age population in any of the north-south multimember districts proposed by the Plaintiffs. *See* 793 F.Supp. at 1414-15.

On appeal, the Plaintiffs do not challenge the district court's findings on their straightforward vote fragmentation challenge. Indeed, the Plaintiffs' own expert on this question, Senator Kirksey,

conceded at trial that blacks would not constitute a majority of the voting age population in any of the proposed north-south multimember districts. Even in the proposed Western District, which would contain the greatest concentration of blacks, Senator Kirksey opined that the voting age population would only be 48-49% black. Therefore, on the record before us, the district court correctly held that the Plaintiffs failed to satisfy the first *Gingles* requirement with respect to their straightforward line-drawing or vote fragmentation challenge.[4]

C. The Hybrid Line-Drawing/Multimember Challenge

Finally, the district court rejected the Plaintiffs' hybrid line-drawing/multimember challenge. In doing so, the district court disagreed with the Defendants' argument that such a claim is not cognizable under section 2. The district court then concluded, however, that even if Mississippi were divided into three north-south districts, and the proposed Western District were further divided into three subdistricts, the Plaintiffs still could not demonstrate a section 2 violation. The district court found that, although the Plaintiffs satisfied all three *Gingles* threshold factors in the proposed Western District, *see* 793 F.Supp. at 1415-16, their claim failed under the totality of circumstances inquiry. The district court specifically found that Mississippi's "valid state policies"—in maintaining east-west districts and in preserving county lines—foreclosed the Plaintiffs' hybrid claim. *See* 793 F.Supp. at 1417-18.

We affirm the district court's decision to reject the Plaintiffs' hybrid line-drawing/multimember challenge, but on other grounds. In particular, we conclude that the district court, having rejected the Plaintiffs' challenge to the at-large or multimember feature of the Central Supreme Court district, should have rejected the Plaintiffs' hybrid challenge as seeking to circumvent its finding of no legally significant white bloc voting.

It is important to understand the implications of the Plaintiffs' hybrid challenge in the context

---

[4]We note that the Plaintiffs have not alleged an "influence dilution" claim. That is, they have not argued that the current east-west district lines operate to minimize their ability to influence elections. *Compare Voinovich,* --- U.S. ----, 113 S.Ct. at 1157. Rather, the Plaintiffs have consistently maintained that they are being deprived of the ability to constitute a *majority* in a Mississippi Supreme Court district. Therefore, we need not decide today whether an influence dilution claim is cognizable under section 2.

of their challenge to the at-large or multimember feature of the current election districts. The hybrid challenge would allow the Plaintiffs to effectively get around their inability to meet the third *Gingles* threshold requirement in the existing Central District, *see supra* Part III.A.—specifically, by using the entire state of Mississippi as the challenged election district in order to demonstrate legally significant white bloc voting.

In our view, the Plaintiffs' inability to show legally significant white bloc voting in the Central District defeats their hybrid challenge. After all, their proposed subdistrict in the hypothetical Western District encompasses almost all of the area in their proposed subdistrict in the existing Central District. Thus, the Plaintiffs are effectively attempting, by casting their claim as a line-drawing challenge, to attack the *multimember* aspect of the existing Central District; however, rather than relying on voting statistics from that district, as required by *Gingles,*[5] the Plaintiffs seek to rely on *statewide* voting statistics to establish legally significant white bloc voting.

Accordingly, we hold that the Plaintiffs cannot obviate their failure of proof on the third *Gingles* factor in the Central District by looking at some hypothetical district—in this case the state as a whole. This is the sort of bootstrapping that section 2 does not permit.[6]

## IV. CONCLUSION

The district court did not clearly err in finding that the Plaintiffs failed to satisfy the *Gingles*

---

[5]According to the Supreme Court's opinion in *Gingles,* the "inquiry into the existence of vote dilution caused by submergence in a multimember district is district specific." 478 U.S. at 59, 106 S.Ct. at 2771.

[6]Having held that the Plaintiffs cannot satisfy their burden under the third *Gingles* factor by pointing to voting behavior in a hypothetical district which encompasses the entire state of Mississippi, we need not decide (a) whether minority plaintiffs challenging an existing multimember election district can add seats to the elected body or (b) whether minority plaintiffs challenging the existing district lines can draw extra lines in order to satisfy the first *Gingles* requirement. We recognize that the Seventh Circuit, in *McNeil v. Springfield Park Dist.,* 851 F.2d 937, 946 (7th Cir.1988), *cert denied* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989), held that minority plaintiffs cannot hypothetically expand the elected body to satisfy the first *Gingles* factor. One might argue, however, that the considerations implicated by the first *Gingles* requirement, which specifically contemplates the creation of hypothetical districts, are distinguishable from the considerations implicated by the second and third *Gingles* requirements—both of which require, in the context of a challenge to the at-large aspect of an election scheme, a district-specific analysis of voting behavior. In any event, these questions about hypothesizing more seats or drawing more lines to establish the first *Gingles* requirement are best left for another day.

threshold requirements on their straightforward challenges to the current multimember districts and the current east-west district lines. As for the Plaintiffs' hybrid line-drawing/multimember challenge, we hold that it is an attempt to recast the Plaintiffs' challenge to the existing Central District, an attempt that must fail under the third *Gingles* factor. We do not reach the Plaintiffs' arguments that the district court erred in assessing the totality of the circumstances. For these reasons, the district court's decision dismissing the Plaintiffs' complaint is AFFIRMED.