REVISED JULY 3, 2001

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

No. 99-60505

_____

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
Etc; ET AL,

          Plaintiffs,

ELIJAH WILSON; ROBERT LEFLORE,

          Plaintiffs-Appellants,

versus

KIRK FORDICE, Etc; ET AL,

          Defendants,

KIRK FORDICE, Governor of the State of Mississippi,
In His Official Capacity and as Member of the State of
Mississippi State Board of Election Commissioners;
MIKE MOORE, Attorney General of the State of
Mississippi, In His Official Capacity and as Member of
the State of Mississippi State Board of Election
Commissioners; DICK MOLPUS, Secretary of State of
the State of Mississippi, In His Official Capacity and
as Member of the State of Mississippi State Board of
Election Commissioners; THE STATE OF MISSISSIPPI
STATE BOARD OF ELECTION COMMISSIONERS;
MISSISSIPPI DEMOCRATIC PARTY EXECUTIVE
COMMITTEE,

          Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Mississippi

_____

May 17, 2001

Before GARWOOD, HIGGINBOTHAM, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

The issues before us today are whether the district court erred in finding that the Plaintiffs-Appellants met their burden of proof under the first necessary precondition of a Section 2 Voting Rights claim, and whether the district court erred in ultimately denying their claim under its totality of the circumstances inquiry. For the following reasons, we affirm the district court's decision.

FACTUAL AND PROCEDURAL HISTORY

The Central, Northern, and Southern voting districts into which Mississippi is currently divided were drawn in approximately 1840 to organize the election of supreme court justices. In 1886 and 1930, respectively, the state began to elect its three public service commissioners and three transportation commissioners from these districts as well. Since their inception, the configuration of these districts has remained relatively unchanged.

As they presently exist, each of the three districts has an east to west configuration and consists of white voting age population majorities. Plaintiffs-Appellants, Elijah Wilson and Robert Leflore ("Wilson"), claim that maintaining the districts with these white voting age population majorities violates Section 2 of the 1965 Voting Rights Act. See 42 U.S.C. § 1973 (2000). Accordingly, Wilson filed suit in the United States District Court for the Southern District of Mississippi against Defendants-Appellees, Kirk Fordice, Mike Moore, Dick Molpus, the State of Mississippi State Board of Election Commissioners, and the Mississippi Democratic Party Executive Committee ("Fordice"), charging that the use of these districts to elect public service and transportation commissioners impermissibly dilutes the voting strength of Mississippi's African-American citizens.

2

Reasoning that Wilson's claim was barred by res judicata, the district court granted summary judgment in favor of Fordice. On appeal, this court vacated and remanded. NAACP v. Fordice, No. 95-60293 (5th Cir. Dec. 23, 1996). Wilson then sought an order directing reconfiguration of the districts to create a majority African-American voting age population district along the western side of Mississippi. After a bench trial, the district court found that Wilson had failed to prove that the state's three voting districts, as currently configured, violate Section 2 and dismissed his complaint. Wilson now appeals.

DISCUSSION

I.      Standard of Review

We review *de novo* the legal standards a court applies to determine whether Section 2 has been violated. Perez v. Pasadena Indep. Sch. Dist., 165 F.3d 368, 372 (5th Cir. 1999). However, the district court's findings in any Section 2 vote dilution dispute are determinations "peculiarly dependent upon the facts of each case" that require "an intensely local appraisal of the design and impact of the contested electoral mechanisms." Thornburg v. Gingles, 479 U.S. 30, 79, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986). Therefore, we review the district court's findings on the Gingles threshold requirements and its ultimate findings on vote dilution for clear error. Perez, 165 F.3d at 372. We thereby "preserve[] the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law." Gingles, 479 U.S. at 79.

In Anderson v. City of Bessemer, 470 U.S. 564, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985), the Supreme Court articulated general principles that govern the exercise of an appellate court's power to overturn factual findings under the clearly erroneous standard. First, "a finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence

3

is left with the definite and firm conviction that a mistake has been committed." Id. at 573. Appellate courts must, however, carefully heed any such "firm conviction."

In particular, despite an appellate court's conviction that it would have weighed the evidence differently had it been sitting as the trier of fact, it may not reverse a district court's findings when they are based on a plausible account of the evidence considered against the entirety of the record. Id. In other words, when "two permissible views of the evidence exist, the fact finder's choice between them cannot be clearly erroneous." Id. Applying the aforementioned principles to findings under the respective Gingles threshold and totality of the circumstances vote dilution inquiries, this court has stated that if a district court uses the correct legal standards, its findings will not be reversed unless its account was implausible based upon the entirety of the record or the reviewing court is left with the "'definite and firm conviction that a mistake has been committed.'" Magnolia Bar Ass'n, Inc. v. Lee, 994 F.2d 1143, 1147 (5th Cir. 1993)(quoting Anderson, 470 U.S. at 573). II.     Section 2 Voting Rights Claim

A.     Legal Standard

The legal standard governing a voting rights claim is found in Section 2 of the Voting Rights Act of 1965. Section 2 states that:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any state or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivisions are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have

4

less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973.

      B.      Two-Part Analysis

Analysis of a Section 2 claim in this court requires a two-part framework. <u>Magnolia Bar</u>, 994 F.2d at 1146. First, a class of minority voters must satisfy the three threshold preconditions announced in <u>Gingles</u>. <u>Id.</u> Second, the minority voters must offer evidence of the circumstances of the local political landscape. <u>Id.</u> Taken together, the <u>Gingles</u> threshold and "totality of the circumstances" inquiries are the means by which courts determine whether a challenged election practice or procedure has resulted in an abridgement or denial of the right to vote based on color or race in violation of Section 2. <u>Id</u>.

III.    <u>Gingles Threshold Inquiry</u>

To meet the threshold <u>Gingles</u> inquiry, a minority group challenging an electoral mechanism must prove three elements by a preponderance of the evidence. <u>Id.</u> First, it must demonstrate that it is sufficiently large and geographically compact to constitute a voting age majority in a district. Second, the minority group must show that it is politically cohesive. Third, the minority group must demonstrate that the majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority group's preferred candidate. <u>Gingles</u>, 478 U.S. at 50-51; <u>Growe v. Emison</u>, 507 U.S. 25, 40, 113 S. Ct. 1075, 122 L. Ed. 2d 388 (1993)(finding the three <u>Gingles</u> prerequisites applicable to vote dilution claims in single-member districts).

Wilson relies on 1990 decennial census data in configuring three proposed African-American majority voting age population districts. Each of these plans creates a new westernmost district along

5

the Mississippi River with 50.66%, 52.66%, and 50.12% African-American voting age populations respectively. The district court found that these proposed districts satisfy Wilson's burden under the first <u>Gingles</u> precondition. <u>See Westwego Citizens for Better Gov't v. City of Westwego</u>, 946 F.2d 1109, 1117 & n.9 (5th Cir. 1991). Fordice, however, takes issue with this finding and avers that the proposed districts, which were drafted using 1990 census data, have population deviations in excess of the de minimis limits placed on judicial redistricting plans. Based on data from the 1997 and 1998 census estimates, Fordice alternatively asserts that, at the time of trial, Wilson's proffered districts contained excessive population deviations in violation of the constitutional one person, one vote requirement.

These arguments reflect the perplexing issues the district court faced regarding the standard of deviation applicable to satisfy the Constitution's one person, one vote mandate when a voting rights plaintiff submits proposed redistricting plans as well as whether census estimates are adequate to clearly and convincingly rebut the presumptive correctness of decennial census data. We need not, however, resolve these intricate questions on this record. Even assuming arguendo that Wilson satisfied his burden under the first <u>Gingles</u> prerequisite, we are convinced by a detailed review of the record that the trial court correctly determined Wilson's failure to preponderate on the totality of the circumstances factors. We explain in more detail our affirmation of the district court's judgment.

IV.  <u>Totality of the Circumstances Inquiry</u>

Wilson contests the district court's finding that, under the totality of the circumstances, the electoral districts of Mississippi do not dilute the voting strength of the state's African-American citizens.

6

We begin our analysis of Wilson's claim and review of the district court's conclusion with the Senate report that accompanied the 1982 amendments to Section 2. In it, Congress listed several relevant factors in a totality of the circumstances analysis of a vote dilution claim. See Magnolia Bar, 994 F.2d at 1146. They include the following:

> a.      the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
> b.      the extent to which voting in the elections of the state or political subdivision is racially polarized;
> c.      the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
> d.      whether members of the minority group have been denied access to [any candidate slating] process;
> e.      the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
> f.      whether political campaigns have been characterized by overt or subtle racial appeals;
> g.      the extent to which members of the minority group have been elected to public office in the jurisdiction.
> h.      whether there is a sufficient lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;[and]
> i.      whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

Id. at 1147 (citing S. REP. No. 417, 97th Cong., 2d Sess., at 28-29, (1982), *reprinted in* 1982 in U.S.C.C.A.N. 177, 206-07)(alterations in original).

Before making its totality of the circumstances analysis, the district court correctly recognized that it was required to effect a flexible, fact-intensive inquiry predicated on "an intensely local appraisal of the design and impact of the contested electoral mechanisms," Magnolia Bar, 994 F.2d at 1147, "'a searching practical evaluation of the "past and present reality" . . . . [and a] "functional"

7

view of political life.'" League of United Latin Am. Citizens v. Clements, 999 F.2d 831, 860 (5th Cir. 1993)("LULAC IV")(quoting S. REP. at 30, 1982 U.S.C.C.A.N. at 208). Moreover, the district court noted that the totality of the circumstances analysis does not require proof of any particular number of factors or that a majority of them point in a specific direction. See Gingles, 478 U.S. at 45. With these guidelines firmly in mind, the district court made its findings.

A.      History of Official Discrimination and Its Effects

First, the abysmal reality of Mississippi's history of official discrimination regarding the right of African-Americans to register and to vote is evident in the record. Furthermore, the 1990 census data revealed that African-Americans in Mississippi are less educated, suffer from higher unemployment, earn lower incomes, and live in disparate conditions as compared to Mississippi's white citizens. Thus, the negative impact that the state's legacy of discrimination has made on the socioeconomic status of African-Americans is undeniable.

Absent an indication that these facts "actually hamper the ability of minorities to participate," they are, however, insufficient to support a finding that minorities suffer from unequal access to Mississippi's political process. LULAC IV, 999 F.2d at 866. Thus, to support a favorable finding on these factors, Wilson bore the burden to demonstrate that the African-American citizens of Mississippi "do not in fact participate to the same extent as other citizens." Id.

Wilson was unable to make this showing. In fact, his own expert, Dr. Lichtman, acknowledged that in recent years Mississippi's African-American and white citizens have maintained virtual parity in voter turnout.[1] While Wilson also argues that African-Americans in Mississippi

---

[1] Dr. Lichtman testified that in the elections between 1994 and 1996, whites had a slightly increased voter turnout as compared to African-Americans. In 1995, however, African-Americans' voter turnout was slightly higher than that of whites.

8

experience disparate access to the state's political process, because of their depressed economic condition, he presented no evidence at trial to show that any prospective African-American candidate of choice has lost an election or was barred from running because of inadequate resources. In sum, the trial record is devoid of any supportive documentary evidence or testimony from lay witnesses whose personal experiences mirrored the contentions urged by Wilson. As such, the district court's finding adverse to Wilson is not clearly erroneous.

      B.      Racially Polarized Voting and Minority Electoral Success

The district court resolved against Wilson one of the two factors that have been declared as the most important in the totality of the circumstances analysis. See, e.g., Gingles, 478 U.S. at 48 n.15 ("[T]he most important Senate Report factors bearing on § 2 challenges . . . are the 'extent to which minority group members have been elected to public office in the jurisdiction' and the 'extent to which voting in the elections of the state or political subdivision is racially polarized.'")(citation omitted). Although it concluded that Dr. Lichtman's statistical evidence established that racially polarized voting exists to some extent in the state of Mississippi, the district court found that Mississippi's African-American citizens have enjoyed substantial success in elections for positions in the districts at issue. Specifically, in the Central District, Reuben V. Anderson ("Anderson") and Fred L. Banks, Jr. ("Banks"), two African-American candidates, defeated white candidates in the Mississippi Supreme Court elections of 1986 and 1991 respectively.

Wilson asserts that the district court's reliance on the supreme court elections and their attendant white crossover voting was misplaced. He urges that the court should have focused on the 1999, 1995, and 1989 respective defeats of African-American Transportation Commissioner candidates Willie Richardson ("Richardson"), Andrew Jenkins ("Jenkins"), Charles Evers ("Evers"),

9

and Dorothy Benford ("Benford") because those elections represent the offices at issue. See Magnolia Bar, 994 F.2d at 1149; Clark I, 21 F.3d at 97 (stating that elections involving the particular office at issue will be more relevant than elections involving other offices). Thus, Wilson now implores this court to hold that the district court erred.

Noting the pivotal nature of his argument that the district court focused on the wrong races, Wilson seeks to show that the elections of Justices Anderson and Banks were politically atypical and therefore should not serve as the prism through which his Section 2 claim is viewed. Specifically, Wilson notes that Section 2 litigation was ongoing during the time that Anderson was seeking reelection in 1986[2] and when Banks was campaigning in 1991. By 1987, the same year that the Martin opinion was rendered, an African-American Mississippi State Senator, who had also filed a Section 2 lawsuit,[3] introduced a bill to reconfigure Mississippi's supreme court districts.

Wilson argues that in the midst of this political and judicial upheaval regarding the state's supreme court districts, Anderson and Banks received unprecedented support from the white community. He claims that prominent white citizens not only openly aligned themselves with Anderson and Banks,[4] but also championed the candidates' campaigns and unabashedly urged other white voters to help elect them to office. No other African-American candidate in Mississippi's recent political history had received such enthusiastic support from the white community. Taken together with the brewing unrest regarding Mississippi's supreme court districts, Wilson maintains

---

[2] See Martin v. Allain, 658 F. Supp. 1183 (S.D. Miss. 1987).

[3] See Kirksey v. Allain, 635 F. Supp. 347 (S.D. Miss. 1986).

[4] See Magnolia Bar, 793 F. Supp.1386, 1407 (S.D. Miss. 1992) ("Banks had substantial and open white support. . . .").

10

that this unusual circumstance of white crossover voting could signal not the crumbling of racial divides in the state's political process and the burgeoning of African-American access but rather a determination to retain districts that impermissibly dilute the votes of Mississippi's African-American citizens.

Recognizing that Section 2 presents very complex political and legal issues, this court took an accordingly analytical yet pragmatic approach to determining how the success of African-American candidates affects the vote dilution analysis. See Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir. 1973), aff'd sub nom., E. Carrol Parish Sch. Bd. v. Marshall, 424 U.S. 636, 96 S. Ct. 1083, 47 L. Ed. 2d 296 (1976). We refused to "endorse the view that the success of [African-American] candidates at the polls necessarily forecloses the possibility of dilution of the [African-American] vote." Id. at 1307. Cognizant that politics engenders a certain cunning and savvy, we opined that:

> Such success, might, on occasion, be attributable to the work of politicians, who apprehending that the support of a[n] [African-American] candidate would be politically expedient, campaign to insure his election. Or such success might be attributable to political support motivated by different considerations- namely that election of a[n] [African-American] candidate will thwart successful challenges to electoral schemes on dilution grounds.

Id. Accordingly, we refused to "hold that a minority candidate's success at the polls is conclusive proof of a minority group's access to the political process" lest we invite "attempts to circumvent the Constitution." Id. Instead, we chose to require an independent consideration of the record. Id.

Supreme Court and more recent Fifth Circuit precedent also provide that "proof that some minority candidates have been elected does not foreclose a § 2 claim." Gingles, 478 U.S. at 75; Clark v. Calhoun County, 88 F.3d 1393, 1397 (5th Cir. 1996)("Clark II")("'[T]he election of a few minority candidates does not necessarily foreclose the possibility of dilution of the [African-American] vote.'")

11

(citation omitted). This is "particularly true when the election . . . occurs after litigation ha[s] been initiated." Clark I, 21 F.3d at 96 (citing Gingles, 478 U.S. at 57). In fact, "'proof that the election of a minority candidate to political office occurred after initiation of a lawsuit could be a factor mitigating against a finding of increased minority electoral success.'" Id. (citation omitted). Accordingly, the circumstances surrounding recent African-American electoral success in Mississippi are relevant to Wilson's vote dilution claim.

In making its minority electoral success findings, the district court opined that the elections of Justices Anderson and Banks are "[p]lainly . . . the most probative for purposes of determining whether the current districts operate to dilute minority voting strength . . . ." Wilson argues, however, that if the success of Anderson and Banks was attributable to political support motivated by a desire to thwart successful vote dilution challenges, allowing those elections to defeat his claim that the disputed electoral districts dilute the voting power of Mississippi's African-Americans to elect public service and transportation commissioners would circumvent the Constitution. See Zimmer, 485 F.2d at 1307. As such, Wilson contends that the district court should have addressed the unsuccessful campaigns of candidates Richardson, Jenkins, Evers and Benford for the pertinent office of transportation commissioner.

Initially, we observe that this court has previously addressed the circumstances underlying the elections of Anderson and Banks. See Magnolia Bar, 994 F.2d at 1149 (stating that "[a]lthough a close call, we think that the district court could reasonably conclude that the election of two [African-American] judges from the Central District was not aberrational" and reasoning that the district court's conclusion "is plausible in light of the record"). As such, we will not revisit that issue in this appeal. Nonetheless, Wilson correctly observes that exogenous elections are less probative than

12

elections for the particular office at issue, but he fails to fully address the critical evidentiary reality that "the exogenous character of . . . elections does not render them nonprobative . . . ." Rangel v. Morales, 8 F.3d 242, 247 (5th Cir. 1993). Accordingly, the district court was not barred from considering the Banks and Anderson elections in making its determination of minority electoral success regarding the offices of public service and transportation commissioner.

Although Wilson makes the salient point that the district court's Section 2 focus must principally hone in on the transportation commissioner elections, the trial record undercuts the argument. Namely, Wilson's proof regarding the transportation commissioner elections is sorely lacking. The record is simply replete with conclusory allegations that these elections demonstrate that Mississippi's African-American citizens' vote is diluted under the districts' current configuration. Wilson proffered no testimony from the defeated candidates, Richardson, Jenkins, Evers, and Benford, respectively, or other evidence pertaining to the specifics of those unsuccessful campaigns that might arguably have developed a trial record supporting his claim. Simply put, Wilson failed to marshal the quality of evidence needed to complete the electoral picture of the districts in question. Having failed to adequately preponderate on the transportation commissioner races, Wilson's attempt to impugn the district court's ruling in his Section 2 vote dilution case is unavailing.

Finally, Wilson's argument that the district court placed too much weight on the supreme court races ignores the fact that the district court also based its minority electoral success findings on Fordice's evidence that three other African-American candidates have been victorious in recent biracial elections in Mississippi. Specifically, in 1997, Myra Murrell ("Murrell") was elected as tax assessor/collector in Scott County, defeating a white candidate in a county with a 33% black voting age population; Antwinette McCrary ("McCrary") won an at-large council position in the City of

Quitman, a town with a 26.88% black voting age population; and in 1997, Tommy Storey ("Storey") defeated a white candidate in the majority white Tippah County.[5]

Thus, despite Wilson having grounded his appellate argument substantially on the district court's purported error in solely relying on the Banks and Anderson elections, the record contains evidence of several other African-American electoral successes. While "consistent minority electoral success does not as a matter of law foreclose a Section 2 claim, . . . [it] is 'presumptively inconsistent' with [such] a claim." Overton v. City of Austin, 871 F.2d 529, 538 n.10 (5th Cir. 1989) (quoting Gingles, 478 U.S. at 76). Therefore, under this circuit's precedent, the district court correctly reasoned that the Murrell, McCrary, and Storey as well as the Banks and Anderson elections are probative to the instant Section 2 case, and absent any other countervailing evidence in the record, we cannot say that it erred by relying on these elections to ultimately conclude that the electoral success of African-Americans in Mississippi militates against a finding of vote dilution. See Rangel, 8 F.3d at 247 (finding that the district court erroneously disregarded evidence of a body of exogenous elections when only one indigenous election was available).

    C.    Remaining Factors

        1.    <u>Election Districts: Size, Multi-Member, and Majority Vote Requirement</u>

Of the remaining factors, the district court did not find favorably for Wilson. It found that the districts at issue were necessarily large, but are not used in potentially discriminatory procedures or voting practices. The effects of multi-member districts is a moot question because the electoral districts for public service and transportation commissioners are single member districts.

_____

[5] The court noted that Dr. Lichtman's analysis did not account for these elections.

Regarding the majority vote requirement, the district court reasoned that the requirement itself was not discriminatory. See Magnolia Bar, 793 F. Supp. at 1409 ("Although abolition of the majority vote requirement . . . might increase chances for electoral success of [African-American] candidates, a majority vote requirement is not inherently discriminatory."). Wilson argues, however, that the use of a majority vote requirement in majority white voting age population election districts that experience racially polarized voting constitutes minority vote dilution. See Clark II, 88 F.3d at 1398 (observing that "under certain circumstances, the majority vote requirement 'can operate to the detriment of minority voters' and negate their potential strength") (quoting Westwego, 946 F.2d at 113 n.4). The facts in Clark II, however, differ from the facts on record in the case at bar.

In Clark II, the specter of racially polarized voting combining with the majority vote requirement to dilute minority voting strength was "more than a mere theoretical possibility." Id. Tommy Pittman ("Pittman"), the only African-American Democratic candidate for Constable, finished first in the primary among all of the other candidates, who were white, but Pittman lost the run-off election. Id. at 1399. Wilson briefly mentioned the defeat of Roger Crowder ("Crowder") in a 1995 run-off election for agriculture commissioner, but presented no supporting facts to show that racial bloc voting caused his defeat. Interestingly, Wilson's own proof regarding the 1995 election reveals that Crowder received 47% of the white vote in counties with more than 80% white voting age populations. Thus, based on Wilson's evidence, the district court did not err in making its finding under the majority vote requirement factor in favor of Fordice.

### 2. Candidate Slating and Racial Appeals

Mississippi does not use a candidate slating process and the district court concluded that Wilson offered no evidence of racial appeals in Mississippi campaigns. Our review of Wilson's

appellate arguments and the record before us supports the district court's conclusion. Regarding the campaigns of African-American candidates Richardson, Jenkins, Evers and Benford, who sought election to the office of transportation commissioner, Wilson did not specifically aver that their campaigns were marred by racial appeals. As such, the district court did not err in finding that these factors do not support Wilson's vote dilution claim.

### 3. Responsiveness

Moreover, to demonstrate the alleged lack of responsiveness by the Transportation or Public Service Commissioners to the needs of African-American citizens, Wilson merely stated that only 15% of Mississippi's Department of Transportation employees are African-Americans. He fails, however, to explain how this employment rate demonstrates that the office was not responding to the needs of the state's African-American citizens. And evidence of the percentage of African-Americans employed by Mississippi's Department of Transportation, standing alone, is insufficient to demonstrate a lack of responsiveness to the needs of the state's African-American citizens. See Clark II, 88 F.3d at 1400 (disagreeing with the district court's adjudication of responsiveness by "counting members of county commissions" and reasoning that "[t]he number of minority members on county commissions is a poor barometer of the county's responsiveness to the needs of its [African-American] citizenry"). Moreover, Northern District Transportation Commissioner Zack Stewart ("Stewart") testified that in the fifteen years that he has held his office, "there [has] never been any question regarding race before [the] commission." As Wilson proffered proof neither to contravene Stewart's testimony nor to elucidate his allegations of unresponsiveness, the district court was not erroneous in finding that this factor did not support his Section 2 complaint. See Westwego, 946 F.2d at 1123 ("The district court found that the plaintiffs had not adequately proved a lack of

16

responsiveness, and after reviewing all of the evidence, we cannot say that the district court clearly erred in so finding.").

### 4.    Tenuousness

The sole remaining factor is whether the policies underlying Mississippi's use of the three electoral districts is tenuous. Fordice asserts that Mississippi has a legitimate, nontenuous interest in perpetuating the east to west district lines. Under the districts' current configuration, Mississippi is organized into six Department of Transportation "maintenance districts," each complete with a headquarters, testing laboratory, and other physical plant features. Fordice contends that to reorganize these facilities to accommodate Wilson's proffered change in district lines would not only cost millions of dollars, but also severely hamper the Department's efficient operation because each district's engineer and crews have particular knowledge of and familiarity with the highways within their districts.

Wilson argues, however, that Fordice failed to prove and the district court did not find that only white majority voting age population districts could achieve the aforementioned policies. He alternatively contends that, even if the district court were correct in concluding that Fordice's asserted policies for maintaining the three east to west districts are non-tenuous, non-tenuousness is not a defense to a plan that is otherwise racially discriminatory. See Clark II, 88 F.3d at 1401 ("'The weight, as well as tenuousness, of the state's interest is a legitimate factor in analyzing the totality of circumstances, [however] . . . [p]roof of a merely non-tenuous state interest discounts one *Zimmer* factor, but cannot defeat liability.'") (quoting LULAC IV, 999 F.2d at 870).

The record supports Fordice's argument that Mississippi's reasons for maintaining the three east to west districts for electing public service and transportation commissioners are nontenuous.

17

Stewart testified extensively on direct and cross-examination regarding the expense and inefficiency that would be associated with adopting Wilson's proposed districts. Because, the record contains no evidence to the contrary, Wilson failed to meet his burden of proof on the tenuousness factor. Therefore, the district court did not err in finding that Fordice's stated interests in preserving the public service and transportation commissioner districts in their current configuration are nontenuous.

V.      Meeting Gingles: Effect on Totality of the Circumstance Analysis and Dilution Finding

Although the district court articulated factual grounds upon which it decided each of the factors in its totality of the circumstance analysis, Wilson asserts that the court erred in finding that Mississippi's electoral districts for public service and transportation commissioners, as currently configured, do not dilute the voting strength of the state's African-American citizens. He cites the following language to support his position:

> [I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three Gingles factors but still have failed to establish a violation of § 2 under the totality of circumstances. In such cases, the district court must explain with particularity why it has concluded, under the particular facts of that case, that an electoral system that routinely results in white voters voting as a bloc to defeat the candidate of choice of a politically cohesive minority group is not violative of § 2 of the Voting Rights Act.

Clark I, 21 F.3d at 97. Therefore, after the district court found that he established the Gingles preconditions to a vote dilution claim, Wilson argues that the evidence should have demonstrated similar findings under the district court's totality of the circumstances analysis.

The United States Supreme Court addressed the relationship between the Gingles and totality of the circumstances inquiries of the two-step section 2 vote dilution claim in Johnson v. DeGrandy, 512 U.S. 997, 114 S. Ct. 2647, 129 L. Ed. 2d 775 (1994). Fordice notes that the Court emphatically

18

rejected the suggestion that courts can rely solely on the three <u>Gingles</u> preconditions to establish a Section 2 dilution violation or to view less critically the totality of the circumstances if those preconditions have been satisfied in a particular case. <u>See id.</u> at 1011-12. The Court reasoned that Congress intended "ultimate conclusions about equality or inequality of opportunity . . . to be judgments resting on comprehensive, not limited, canvassing of relevant facts." <u>Id</u>. at 1011. As such, the Court admonished that "fact finders cannot rest uncritically on assumptions about the force of the <u>Gingles</u> factors in pointing to dilution." <u>Id</u>. at 1013. This court has previously recognized and applied the reasoning of <u>Johnson</u>. <u>See Teague v. Attala County</u>, 92 F.3d 283, 287 (5th Cir. 1996)(stating that even if the plaintiffs satisfy the <u>Gingles</u> prerequisites, the district court "must still look to the 'totality of the circumstances' to determine whether the challenged electoral system is equally open to minority voters").

Wilson correctly relies on <u>Clark I</u> to contend that the district court, after having found that he met the <u>Gingles</u> preconditions, was required to explain with particularity why it concluded that the contested electoral districts, which routinely result in white bloc voting, do not violate Section 2 of the Voting Rights Act. We find that the district court met this requirement. In summary, the district court found that, although Mississippi has an undeniable history of official discrimination from which its African-American citizens still suffer the effects, Wilson failed to demonstrate that this reality hindered the ability of Mississippi's African-American citizens to participate effectively in the state's political process. Moreover, the court determined that the factors of majority vote requirement, the size of the contested electoral districts, candidate slating, responsiveness, and tenuousness did not favor Wilson. The record before us supports the district court's determinations regarding these factors. As such, we cannot conclude that these findings were clearly erroneous.

19

Finally, the paucity of proof that Wilson presented regarding minority electoral success was inadequate to convince the district court that this factor favored a finding of vote dilution. As previously discussed, although Fifth Circuit precedent unequivocally states that evidence from elections for the office at issue is more probative than that of exogenous elections, e.g., Clark II, 88 F.3d at 1397, it does not bar limited consideration of exogenous elections. See Rangel, 8 F.3d at 247. Accordingly, the district court was well within its authority to consider the elections of Anderson and Banks as well as Murrell, McCrary, and Storey in its "'intensely local appraisal' of the social and political climate of the cities and counties in which" Wilson filed the instant Section 2 suit. See LULAC IV, 999 F.2d at 867 (citing White v. Regester, 412 U.S. 755, 769, 93 S. Ct. 2332, 37 L. Ed. 2d 314 (1973)). Because the district court "anchor[ed] its judgment in evidence[,]" Clark II, 88 F.3d at 1397, we cannot declare implausible its conclusion that sufficient proof of minority electoral success exists to overcome Wilson's vote dilution claim. As such, in the instant dispute, irrespective of whether the district court correctly concluded that Wilson met the Gingles prerequisites, he ultimately failed to prove vote dilution under the totality of the circumstances. Therefore, the district court did not commit clear error in dismissing Wilson's Section 2 vote dilution claim.

## CONCLUSION

Accordingly, we AFFIRM the district court's ruling.

AFFIRMED.