PER CURIAM: *
Reverend Kenneth E. Fairley, Sr., Reverend D. Franklin Browne, Dennis D. Henderson, Carlos Wilson, Fred Burns, Charles Bartley, and Clarence Magee (collectively, “Plaintiffs”) brought suit against Hattiesburg, Mississippi (“Hattiesburg”). The complaint alleged causes of action under Section 2 of the Voting Rights Act, the Equal Protection Clause, and the Fifteenth Amendment.[1] After a bench trial, the district court entered judgment in favor of Hattiesburg on Plaintiffs’ claim under Section 2 of the Voting Rights Act. Plaintiffs appealed. Finding no error, we AFFIRM.
I.
A.
Hattiesburg has a mayor-council form of government, under which a mayor exercises the city’s executive power, Miss. Code Ann. § 21-8-15, and a five-member city council serves as the city’s legislative body, id. § 21-8-9. Whereas the mayor is elected citywide, each city council member is elected by ward, and each of the five wards must contain “as nearly as possible” a fifth of the population “as shown by the most recent decennial census.” Id. § 21-8-7(4)(a), (b). The city council must redistrict when necessary after each census. Id. § 21-8-7(4)(c)(i).
Prior to the 2010 census, Hattiesburg had a majority white total population and voting-age population. The 2010 census data revealed, however, that African Americans are now a majority of the total population and a plurality of the voting-age population. Specifically, 53.92% of the total population was “any part black,” and 40.48% of the total population was “non-Hispanic white.” As to the voting-age population, 48.50% was “any part black,” and 45.98% was “non-Hispanic white.”
Following the 2010 census, the city council hired Chris Watson to assist with the requisite redistricting. Watson.began by reviewing the degree of imbalance and how much numerical change each ward would have to undergo to correct that imbalance. His review revealed a significant imbalance that would require redistricting. Watson submitted various redistricting *294 plans to the city council, and these plans were the subject of several public hearings.
At the end of this process, the city council effectively had three plans from which to choose. The city council eventually adopted the Revised Proposed Redistricting Plan (“Adopted Plan”), which Chris Watson originated. The Adopted Plan would create three majority white wards (Wards 1, 3, and 4) and two majority African-American wards (Wards 2 and 5). The Community Political Action Committee (“CPAC”) submitted a plan (“CPAC Plan”) that would create three majority African-American wards (Wards 1, 2, and 5) and two majority white wards (Wards 3 and 4). Finally, Councilman Henry Naylor worked with Watson to create a plan (“Naylor Plan”) that would create three majority African-American wards (Wards 1, 2, and 5) and two majority white wards (Wards 3 and 4).[2] When the city council voted on what plan to implement, the Adopted Plan received three votes, the CPAC plan received one vote, and the Naylor Plan received one vote. The Adopted Plan then received preclearance from the Justice Department under Section 5 of the Voting Rights Act.
B.
Prior to trial, the parties stipulated to the following facts, among others:
The City council elected in 2001 consisted of three white councilpersons and two African-American councilpersons.
[[Image here]]
The City council elected in 2009 consisted of three white councilpersons and two African-American councilpersons.
[[Image here]]
In the City’s June 4, 2013 general election, each of the incumbent councilpersons was reelected.
[[Image here]]
Johnny Dupree[, an] African American[,] won the contested city-wide general election in Hattiesburg, Mississippi, for Mayor, in 2001, 2005, and 2013. Mayor Dupree was elected without opposition in 2009.
[[Image here]]
Legally significant racial bloc voting exists in white versus African American city elections in 2001, 2005, 2009 and 2013 in Hattiesburg, Mississippi.
Based on 2010 census data in Hatties-burg, ■ Mississippi, a five (5) ward city council redistricting plan could be drawn with three (3) African American voting age population wards.
The African American population in Hattiesburg, Mississippi, is sufficiently large and geographically compact to constitute a majority of the voting age population in three (3) of the five (5) wards.
The parties further stipulated to the specific results in various elections and to the racial composition of the wards under the Adopted Plan. The district court also granted a motion to take judicial notice of various facts related to a prior lawsuit involving Hattiesburg stemming from a 2004 redistricting plan. See Fairley v. Hattiesburg (Fairley I), 584 F.3d 660 (5th Cir. 2009).
The district court held a three-day bench trial. The parties put on evidence regarding the plans that the .city council considered, the extent to which voting in Hattiesburg is racially polarized, and the extent to which the city council was receptive to the needs of the African-American *295 community. The district court entered final judgment in favor of Hattiesburg, and Plaintiffs timely appealed.
II.
We have jurisdiction over this appeal of a final judgment. 28 U.S.C. § 1291. “In reviewing a district court’s decision regarding an alleged violation of Section 2 of the Voting Rights Act, this court analyzes the legal standards applied by a district court de novo and the factual findings for clear error.” Rodriguez v. Bexar Cty., 385 F.3d 853, 860 (5th Cir. 2004) (citation omitted). Under the clear error standard, “[i]f the district court’s findings are plausible in light of the record viewed in its entirety, we must accept them, even though we might have weighed the evidence differently if we had been sitting as a trier of fact.” Price v. Austin Indep. Sch. Dist., 945 F.2d 1307, 1312 (5th Cir. 1991) (quoting Norris v. Hartmarx Specialty Stores, Inc., 913 F.2d 253, 255 (5th Cir. 1990)).
III.
A.
Section 2 of the Voting Rights Act prohibits the imposition of a “voting qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen ... to vote on account of race or color.” 52 U.S.C. § 10301(a). Section 2(b) creates a “results test,” which evaluates whether, based on the totality of the circumstances, “the political processes leading to nomination or election ... are not equally open to participation by members of a class of citizens .., in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.” Id. § 10301(b).
There are three threshold preconditions that must be satisfied before a Section 2 violation can be established: (1) the racial group must be “sufficiently large and geographically compact to constitute a majority in a single-member district”; (2) the racial group must be “politically cohesive”; and (3) the majority must “vot[e] sufficiently as a bloc to enable it ... usually to defeat the minority’s preferred candidate.” League of United Latin Am. Citizens v. Perry (LULAC v. Perry), 548 U.S. 399, 425, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006) (quoting Thornburg v. Gingles, 478 U.S. 30, 50-51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986)). Hattiesburg conceded that these three Gingles preconditions were satisfied, and we therefore do not address them on appeal.
If the' three Gingles preconditions are satisfied, we must “consider the ‘totality of circumstances’ to determine whether members of a racial group have less opportunity than do other members of the electorate.” LULAC v. Perry, 548 U.S. at 425-26, 126 S.Ct. 2594. In assessing the totality of the circumstances, “the Court has referred to the Senate Report on the 1982 amendments to the Voting Rights Act, which identifies factors typically relevant to a § 2 claim[.]” Id. at 426, 126 S.Ct. 2594. These so-called “Senate Factors” are as follows:
1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures *296 that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;
7. the extent to which members of the minority group have been elected to public office in the jurisdiction.
[[Image here]]
[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]
[9.] whether the policy underlying the state or political subdivision’s use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.
Gingles, 478 U.S. at 36-37, 106 S.Ct. 2752 (quoting S. Rep. No. 97-417, at 28-29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 206-07). “Another relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area.” LULAC v. Perry, 548 U.S. at 426, 126 S.Ct. 2594 (citing Johnson v. De Grandy, 512 U.S. 997, 1000, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994)). “[T]he existence of racially polarized voting and the extent to which minorities are elected to public office remain the two most important factors considered in the totality-of-circumstances inquiry.” Clark v. Calhoun Cty. (Clark II), 88 F.3d 1393, 1397 (5th Cir. 1996).
This list of factors is not exhaustive, and “there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.” Gingles, 478 U.S. at 45, 106 S.Ct. 2752 (quoting S. Rep. No. 97-417, at 29). Moreover, “[n]ot every factor will be relevant in every case.” Veasey v. Abbott, 830 F.3d 216, 246 (5th Cir.) (en banc), petition for cert. filed, No. 16-393 (Sept. 23, 2016). Rather, “the proper assessment of vote dilution claims is ‘peculiarly dependent upon the facts of each case’ and requires ‘an intensely local appraisal of the design and impact of the contested electoral mechanisms.’ ” Rodriguez, 385 F.3d at 860 (quoting angles, 478 U.S. at 79, 106 S.Ct. 2752).
' We have agreed that “it will be only the very unusual case in which the plaintiffs can establish the existence of the three angles [preconditions] but still have failed to establish a violation of § 2 under the totality of circumstances.” Clark v. Calhoun Cty. (Clark I), 21 F.3d 92, 97 (5th Cir. 1994) (quoting Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 4 F.3d 1103, 1135 (3d Cir. 1993)). Yet the totality of the circumstances inquiry is not an empty formalism, and satisfying the angles preconditions does not necessitate liability. Clark II, 88 F.3d at 1396-97. “To the contrary, this final inquiry can be powerful indeed.” Id. at 1397.
“[I]f a district court uses the correct legal standards, its findings will not be reversed unless its account was implausible based upon the entirety of the record or the reviewing court is left with the ‘definite and firm conviction that a mistake has been committed.’ ” N.A.A.C.P. v. Fordice, 252 F.3d 361, 365 (5th Cir. 2001) (quot *297 ing Magnolia Bar Ass’n v. Lee, 994 F.2d 1148, 1147 (5th Cir. 1998)). This standard “preserves the benefit of the trial court’s particular familiarity with the indigenous political reality without endangering the rule of law.” Gingles, 478 U.S. at 79, 106 S.Ct. 2752.
B.
The district court summarized its findings relating to the totality of the circumstances as follows:
1. Hattiesburg has a history of official racial discrimination, but all such practices ceased many years ago. This factor weighs slightly in favor of Plaintiffs.
2. Voting is highly polarized along racial lines in Hattiesburg. Blacks most often vote for blacks, and whites most often vote for whites. This factor weighs in favor of Plaintiffs.
3. There is no evidence that the majority-vote requirement hinders African-American electoral opportunity. This factor weighs in favor of Defendants.
4. Although there exists a substantial socioeconomic disparity between Hat-tiesburg’s African-American citizens and its white ones, it does not hinder African-Americans’ voting and participation in the City’s political process. This factor weighs in favor of Defendants.
5. There is no evidence of racial appeals in Hattiesburg’s city elections. This factor weighs in favor of Defendants.
6. No African-American has ever been elected to the City Council from Wards 1, 3, or 4. However, Hattiesburg’s African-American mayor has enjoyed substantial electoral success, and he wields a considerable amount of power in the mayor-council form of municipal government. This factor weighs slightly in favor of Plaintiffs.
7. The evidence overwhelmingly demonstrates that Hattiesburg’s elected officials, including its white City Council members, are responsive to the needs of the African-American community. This factor weighs in favor of Defendants.
8. The Council Plan furthers the City’s legitimate, non-tenuous interests. This factor weighs in favor of Defendants.
9. The number of districts in which African-Americans form an effective majority is roughly proportional to their share of the City’s population, particularly when one considers voting-age population. This factor weighs in favor of Defendants.
The district court ultimately concluded that “Hattiesburg’s current ward plan does not practically hinder African-Americans’ opportunity to participate in the political process and elect representatives of their choice. The evidence demonstrates that African-Americans in Hattiesburg enjoy political power in rough proportion to their share of the voting-age population, and that they actively exercise such power through the political process.”
C.
1.
Plaintiffs maintain that the district court incorrectly relied upon the election of Hattiesburg’s African-American mayor to diminish the significance of two of the Senate Factors: the extent to which minority group members have been elected to public office and the extent to which voting is racially polarized. However, we have approved the use of so-called exogenous elections, see Rodriguez, 385 F.3d at 860 n.5, although we recognize their limited probative value, see Clark II, 88 F.3d at 1397 (“[EJxogenous elections ... are less probative than elections involving the specific office that is the subject of the litigation.”). In accordance with this precedent, *298 the district court acknowledged that the mayoral election was of limited relevance and even discounted the significance of the state and national election data. In light of our acceptance of the limited use of exogenous elections, the district court did not err in relying on the citywide election of an African-American mayor in its findings as to these two Senate Factors.
2.
Plaintiffs also take issue with the district court’s finding regarding the effects of discrimination on the ability of African Americans to participate in the political process, highlighting the evidence of socioeconomic disparities that was presented at trial. However, “proof of socioeconomic disparities and a history of discrimination ‘without more’ ” does not demonstrate that a group of citizens has less opportunity to participate in the political process. Clark II, 88 F.3d at 1399. Indeed, Congress “clearly did not dispense with proof that participation in the political process is in fact depressed among minority citizens.” League of United Latin Am. Citizens, Council No. 4434 v. Clements (LULAC v. Clements), 999 F.2d 831, 867 (5th Cir. 1993) (en banc). As evidence that participation is depressed, Plaintiffs point to the analysis of their expert, Allan Lichtman, who concluded that “[sjocio-economic disadvantages make it more difficult for African Americans than whites to find qualified candidates for political office, to fund campaigns, and to must[er] supporters to the polls.”
Testimony regarding depressed political participation relevant to a local election must be grounded in a local appraisal of the facts. See Fordice, 252 F.3d at 368 (noting that “to support a favorable finding on [whether socioeconomic disparity hampers the ability of minorities to participate], [the plaintiff] bore the burden to demonstrate that the African-American citizens of Mississippi ‘do not in fact participate to the same extent as other citizens’ ” (emphasis added) (quoting LULAC v. Clements, 999 F.2d at 866)); see also Clark II, 88 F.3d at 1399 (rejecting an expert’s testimony that “individuals of lower socioeconomic status were not as likely to vote as individuals of higher socioeconomic status” because it was not based on “an intensely local appraisal of the social and political climate”). Lichtman’s testimony and report are not evidence that African Americans in Hattiesburg actually have depressed political participation, but rather support the theory that socioeconomic disparity can effect political participation generally. The district court was not required to accept Lichtman’s testimony on this point. See LULAC v. Clements, 999 F.2d at 867-68 (concluding that Plaintiffs “ha[d] not established that the effects of past discrimination ha[d] hindered their ability to participate in the political process” where their expert’s testimony amounted to “support for the common sense proposition that depressed political participation typically accompanies poverty and a lack of education[ ] ... [and was not] proof that minority voters in this case failed to participate equally in the political processes” (emphasis in original)).[3]
*299 3.
Plaintiffs also challenge the district court’s finding regarding Hattiesburg’s responsiveness to the African-American community. According to Plaintiffs, the district court incorrectly relied on the fact that over 90% of the city council votes were unanimous. To Plaintiffs, the relevant consideration is the percentage of divided city council votes that are divided on racial lines. Not only do Plaintiffs cite no authority that the responsiveness factor somehow turns on this metric, but also Plaintiffs fail to address the plethora of evidence supporting the district court’s finding that Hattiesburg was responsive.[4] See Westwego Citizens for Better Gov’t v. City of Westwego, 946 F.2d 1109, 1118 (5th Cir. 1991) (“A finding of fact is ‘clearly erroneous’ only when although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” (citing Campos v. City of Baytown, 840 F.2d 1240, 1243 (5th Cir. 1988))). In fact, we have previously noted that this factor has two facets: “the provisions of municipal services to neighborhoods populated by minority group members [and] the distribution of municipal jobs and appointments to various boards and commissions.” David v. Garrison, 553 F.2d 923, 929 (5th Cir. 1977); see also Jones v. City of Lubbock, 727 F.2d 364, 381 (5th Cir. 1984) (examining municipal services, minorities in public employment, and projects of interest to the minority community). As to both of these facets, the district court found in favor of Hattiesburg. Finding no error, we will not disrupt the district court’s finding as to responsiveness.
4.
Next, Plaintiffs criticize the district court’s finding as to tenuousness. As to this factor, the district court discussed the testimony of councilmembers that the primary goal in redistricting was to correct the deviation in the wards’ population with as little change to the ward lines as possible. It also noted the testimony of Chris Watson that he created the Adopted Plan with the goal of correcting the population deviation and “causing as little change to the existing ward lines as possible, causing as few voters to change voting precincts as possible, maintaining all of the communities of interest, and respecting traditional geographical boundaries.” These goals align with traditional districting principles. See Chen v. City of Houston, 206 F.3d 502, 512 (5th Cir. 2000); see also Evenwel v. Abbott, — U.S. -, 136 S.Ct. 1120, 1124, 194 L.Ed.2d 291 (2016) (“[W]hen drawing state and local legislative districts, jurisdictions are permitted to deviate somewhat from perfect population equality to accommodate traditional districting objectives, among them, preserving the integrity of political subdivisions, maintaining communities of interest, and creating geographic compactness.”). Plaintiffs have failed to establish how this finding was clearly erroneous.
ic-
The focus of Plaintiffs’ appeal concerns the district court’s treatment of *300 rough proportionality. The district court ultimately found that “[t]he number of districts in which African-Americans form an effective majority is roughly proportional to their share of the City’s population, particularly when one considers voting-age population. This factor weighs in favor of Defendants.” In making this finding, the district court noted that, on the facts of the case:
Strict proportionality is impossible. Regardless of the result, one side of this dispute will get forty percent of the voting power (2 out of 5 Council positions), while the other will get sixty percent (3 out of 5). With the current population numbers, there is no way to apportion five seats and achieve strict proportionality. There will necessarily be an imbalance in one direction or the other.
Among other arguments, Plaintiffs contend the district court failed to consider the possibility of a plan that contained a competitive (or “swing”) third ward.
The Supreme Court has noted that “ ‘[proportionality’ as the term is used [in the totality of circumstances analysis] links the number of majority-minority voting districts to minority members’ share of the relevant population.”[5] De Grandy, 512 U.S. at 1014 n.ll, 114 S.Ct. 2647. The proportionality analysis discussed by the Supreme Court in De Grandy utilized voting-age population, but the Supreme Court has declined to endorse the use of voting-age population over total population or vice-versa. See id. at 1014, 1017 n.14, 114 S.Ct. 2647. In accordance with this authority, we have determined that a district court’s use of voting-age population is not clearly erroneous. Fairley I, 584 F.3d at 674; see also African Am. Voting Rights Legal Def. Fund, Inc. v. Villa, 54 F.3d 1345, 1352-53. (8th Cir. 1995). Furthermore, the Supreme Court has cautioned that there is no “magic parameter” and that proportionality “must allow for some deviations.” LULAC v. Perry, 548 U.S. at 438, 126 S.Ct. 2594; see also De Grandy, 512 U.S. at 1017 n.14, 114 S.Ct. 2647. Indeed, if a city drew district lines with the predominant purpose of achieving strict racial proportionality, the city would have to defend the resulting districts under a strict scrutiny analysis. See Miller v. Johnson, 515 U.S. 900, 915-16, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995); see also Ala. Legislative Black Caucus v. Alabama, — U.S. -, 135 S.Ct. 1257, 1267, 191 L.Ed.2d 314 (2015) (“[A] policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote) provides evidence that race motivated the drawing of particular lines in multiple districts in the State.”); Bush v. Vera, 517 U.S. 952, 986, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (plurality opinion) (affirming a district court’s decision declaring Texas’s congressional redistricting effort unconstitutional because of racial gerrymandering to create a majority Hispanic district and majority African-American districts); Miller, 515 U.S. at 927-28, 115 S.Ct. 2475 (“It takes a shortsighted and unauthorized view of the Voting Rights Act to invoke that statute, which has played a decisive role in redressing some of our worst forms of discrimination, to demand the very racial stereotyping the Fourteenth Amendment *301 forbids.”). “In the end, ‘substantial proportionality’ is what matters in the totality-of-circumstances analysis.” Fairley I, 584 F.3d at 674 (citing De Grandy, 512 U.S. at 1015-16, 114 S.Ct. 2647).
Finally, we reject Plaintiffs’ argument that the district court treated rough proportionality as a safe harbor in contravention of LULAC v. Perry, 548 U.S. at 436, 126 S.Ct. 2594. Although the district court gave proportionality great weight, it also gave significant weight to the fact that African Americans in Hattiesburg participate in the political process. According to the language of the district court’s 46-page opinion, proportionality was not, in and of itself, dispositive. See Villa, 54 F.3d at 1356 (“Although the district court’s opinion focuses heavily upon proportionality, it addresses the various other factors.”). Moreover, in accordance with the clear error standard, we will not reweigh the evidence. Fordice, 252 F.3d at 365.
With these principles and considerations in mind, we cannot say that the district court’s finding regarding rough proportionality was clearly erroneous or the result of legal error. Rather, the district court properly took into consideration the local situation in Hattiesburg, including the existence of only five wards and the voting-age population of the city. Although we might have reached a different conclusion based on the evidence, that is not the appropriate test on appeal. See Price, 945 F.2d at 1312.
IV.
The district court fulfilled its role in conducting an intensely local appraisal of the facts. It did not commit reversible error, so we AFFIRM.

 Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

. Following trial, Plaintiffs withdrew their claims under the Equal Protection Clause and the Fifteenth Amendment. These claims are not at issue on appeal.

. Although the possibility of a swing ward was discussed, Plaintiff's counsel conceded at oral argument that, in terms of plans submitted to the council for consideration, “no plans showed a fifth competitive [swing] ward.”

. Indeed, the district court noted that the evidence at trial affirmatively demonstrated that “although Hattiesburg’s African-American citizens have lower incomes, educational levels, and standards of living than its white citizens, they participate in the political process at the same or higher levels.” For exam-pie, Hattiesburg’s African-American citizens historically registered and voted in greater numbers than its white citizens. African Americans in Hattiesburg also participated in the public hearings about redistricting and the City Council’s weekly "Citizens Forum.” The district court further noted that African *299 Americans’ participation in Hattiesburg’s democratic process was "robust.”

. The district court discussed Chris Watson’s testimony that he found no racial disparity in how Hattiesburg funded city services, and that over half of city employees were African American. It further examined two development projects, the relationship between city council and the mayor, and the history of the council’s "Citizens Forum.” Indeed, the district court examined council voting patterns as just one of seven separate considerations under the responsiveness factor.

. Notably, the Court distinguished proportionality as a factor to be considered in the totality of the circumstances analysis "from the subject of the proportional representation clause of § 2, which provides that ‘nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.’ ” De Grandy, 512 U.S. at 1014 n.11, 114 S.Ct. 2647 (quoting 52 U.S.C. § 10301(b)). "[I]t is important to keep the concepts of 'proportionality' and 'proportional representation’ distinct.” Solomon v. Liberty Cty. Comm’rs, 221 F.3d 1218, 1224 n.5 (11th Cir. 2000).