# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

November 28, 2016

Lyle W. Cayce
Clerk

No. 15-60637

REVEREND KENNETH E. FAIRLEY, SR.; REVEREND D. FRANKLIN BROWNE; DENNIS D. HENDERSON; CARLOS WILSON; FRED BURNS; CHARLES BARTLEY; CLARENCE MAGEE,

      Plaintiffs - Appellants

v.

HATTIESBURG MISSISSIPPI; HATTIESBURG MISSISSIPPI DEMOCRATIC EXECUTIVE COMMITTEE; HATTIESBURG MISSISSIPPI REPUBLICAN EXECUTIVE COMMITTEE; HATTIESBURG MISSISSIPPI ELECTION COMMISSION,

      Defendants - Appellees

---

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 2:13-CV-18

---

Before STEWART, Chief Judge, and CLEMENT and HAYNES, Circuit Judges.

PER CURIAM:*

      Reverend Kenneth E. Fairley, Sr., Reverend D. Franklin Browne, Dennis D. Henderson, Carlos Wilson, Fred Burns, Charles Bartley, and Clarence

---

      * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-60637

Magee (collectively, "Plaintiffs") brought suit against Hattiesburg, Mississippi ("Hattiesburg"). The complaint alleged causes of action under Section 2 of the Voting Rights Act, the Equal Protection Clause, and the Fifteenth Amendment.[1] After a bench trial, the district court entered judgment in favor of Hattiesburg on Plaintiffs' claim under Section 2 of the Voting Rights Act. Plaintiffs appealed. Finding no error, we AFFIRM.

## I.

## A.

Hattiesburg has a mayor-council form of government, under which a mayor exercises the city's executive power, MISS. CODE ANN. § 21-8-15, and a five-member city council serves as the city's legislative body, *id.* § 21-8-9. Whereas the mayor is elected citywide, each city council member is elected by ward, and each of the five wards must contain "as nearly as possible" a fifth of the population "as shown by the most recent decennial census." *Id.* § 21-8-7(4)(a), (b). The city council must redistrict when necessary after each census. *Id.* § 21-8-7(4)(c)(i).

Prior to the 2010 census, Hattiesburg had a majority white total population and voting-age population. The 2010 census data revealed, however, that African Americans are now a majority of the total population and a plurality of the voting-age population. Specifically, 53.92% of the total population was "any part black," and 40.48% of the total population was "non-Hispanic white." As to the voting-age population, 48.50% was "any part black," and 45.98% was "non-Hispanic white."

Following the 2010 census, the city council hired Chris Watson to assist with the requisite redistricting. Watson began by reviewing the degree of

---

[1] Following trial, Plaintiffs withdrew their claims under the Equal Protection Clause and the Fifteenth Amendment. These claims are not at issue on appeal.

imbalance and how much numerical change each ward would have to undergo to correct that imbalance. His review revealed a significant imbalance that would require redistricting. Watson submitted various redistricting plans to the city council, and these plans were the subject of several public hearings.

At the end of this process, the city council effectively had three plans from which to choose. The city council eventually adopted the Revised Proposed Redistricting Plan ("Adopted Plan"), which Chris Watson originated. The Adopted Plan would create three majority white wards (Wards 1, 3, and 4) and two majority African-American wards (Wards 2 and 5). The Community Political Action Committee ("CPAC") submitted a plan ("CPAC Plan") that would create three majority African-American wards (Wards 1, 2, and 5) and two majority white wards (Wards 3 and 4). Finally, Councilman Henry Naylor worked with Watson to create a plan ("Naylor Plan") that would create three majority African-American wards (Wards 1, 2, and 5) and two majority white wards (Wards 3 and 4).[2] When the city council voted on what plan to implement, the Adopted Plan received three votes, the CPAC plan received one vote, and the Naylor Plan received one vote. The Adopted Plan then received preclearance from the Justice Department under Section 5 of the Voting Rights Act.

B.

Prior to trial, the parties stipulated to the following facts, among others:

> The City council elected in 2001 consisted of three white councilpersons and two African-American councilpersons.
>
> . . . .

---

[2] Although the possibility of a swing ward was discussed, Plaintiff's counsel conceded at oral argument that, in terms of plans submitted to the council for consideration, "no plans showed a fifth competitive [swing] ward."

No. 15-60637

> The City council elected in 2009 consisted of three white councilpersons and two African-American councilpersons.
>
> . . . .
>
> In the City's June 4, 2013 general election, each of the incumbent councilpersons was reelected.
>
> . . . .
>
> Johnny Dupree[, an] African American[,] won the contested city-wide general election in Hattiesburg, Mississippi, for Mayor, in 2001, 2005, and 2013. Mayor Dupree was elected without opposition in 2009.
>
> . . . .
>
> Legally significant racial bloc voting exists in white versus African American city elections in 2001, 2005, 2009 and 2013 in Hattiesburg, Mississippi.
>
> Based on 2010 census data in Hattiesburg, Mississippi, a five (5) ward city council redistricting plan could be drawn with three (3) African American voting age population wards.
>
> The African American population in Hattiesburg, Mississippi, is sufficiently large and geographically compact to constitute a majority of the voting age population in three (3) of the five (5) wards.

The parties further stipulated to the specific results in various elections and to the racial composition of the wards under the Adopted Plan. The district court also granted a motion to take judicial notice of various facts related to a prior lawsuit involving Hattiesburg stemming from a 2004 redistricting plan. *See Fairley v. Hattiesburg* (*Fairley I*), 584 F.3d 660 (5th Cir. 2009).

The district court held a three-day bench trial. The parties put on evidence regarding the plans that the city council considered, the extent to which voting in Hattiesburg is racially polarized, and the extent to which the city council was receptive to the needs of the African-American community.

No. 15-60637

The district court entered final judgment in favor of Hattiesburg, and Plaintiffs timely appealed.

## II.

We have jurisdiction over this appeal of a final judgment. 28 U.S.C. § 1291. "In reviewing a district court's decision regarding an alleged violation of Section 2 of the Voting Rights Act, this court analyzes the legal standards applied by a district court de novo and the factual findings for clear error." *Rodriguez v. Bexar Cty.*, 385 F.3d 853, 860 (5th Cir. 2004) (citation omitted). Under the clear error standard, "[i]f the district court's findings are plausible in light of the record viewed in its entirety, we must accept them, even though we might have weighed the evidence differently if we had been sitting as a trier of fact." *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1312 (5th Cir. 1991) (quoting *Norris v. Hartmarx Specialty Stores, Inc.*, 913 F.2d 253, 255 (5th Cir. 1990)).

## III.

## A.

Section 2 of the Voting Rights Act prohibits the imposition of a "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color." 52 U.S.C. § 10301(a). Section 2(b) creates a "results test," which evaluates whether, based on the totality of the circumstances, "the political processes leading to nomination or election . . . are not equally open to participation by members of a class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

There are three threshold preconditions that must be satisfied before a Section 2 violation can be established: (1) the racial group must be "sufficiently

No. 15-60637

large and geographically compact to constitute a majority in a single-member district"; (2) the racial group must be "politically cohesive"; and (3) the majority must "vot[e] sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *League of United Latin Am. Citizens v. Perry* (*LULAC v. Perry*), 548 U.S. 399, 425 (2006) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986)). Hattiesburg conceded that these three *Gingles* preconditions were satisfied, and we therefore do not address them on appeal.

If the three *Gingles* preconditions are satisfied, we must "consider the 'totality of circumstances' to determine whether members of a racial group have less opportunity than do other members of the electorate." *LULAC v. Perry*, 548 U.S. at 425–26. In assessing the totality of the circumstances, "the Court has referred to the Senate Report on the 1982 amendments to the Voting Rights Act, which identifies factors typically relevant to a § 2 claim[.]" *Id.* at 426. These so-called "Senate Factors" are as follows:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>
> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
>
> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education,

employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

. . . .

[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]

[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36–37 (quoting S. REP. NO. 97-417, at 28–29 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 206–07). "Another relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area." *LULAC v. Perry*, 548 U.S. at 426 (citing *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994)). "[T]he existence of racially polarized voting and the extent to which minorities are elected to public office remain the two most important factors considered in the totality-of-circumstances inquiry." *Clark v. Calhoun Cty.* (*Clark II*), 88 F.3d 1393, 1397 (5th Cir. 1996).

This list of factors is not exhaustive, and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45 (quoting S. REP. NO. 97-417, at 29). Moreover, "[n]ot every factor will be relevant in every case." *Veasey v. Abbott*, 830 F.3d 216, 246 (5th Cir.) (en banc), *petition for cert. filed*, No. 16-393 (Sept. 23, 2016). Rather, "the proper assessment of vote dilution claims is 'peculiarly dependent upon the facts of each case' and requires 'an intensely

local appraisal of the design and impact of the contested electoral mechanisms.'" *Rodriguez*, 385 F.3d at 860 (quoting *Gingles*, 478 U.S. at 79).

We have agreed that "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* [preconditions] but still have failed to establish a violation of § 2 under the totality of circumstances." *Clark v. Calhoun Cty.* (*Clark I*), 21 F.3d 92, 97 (5th Cir. 1994) (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)). Yet the totality of the circumstances inquiry is not an empty formalism, and satisfying the *Gingles* preconditions does not necessitate liability. *Clark II*, 88 F.3d at 1396–97. "To the contrary, this final inquiry can be powerful indeed." *Id.* at 1397.

"[I]f a district court uses the correct legal standards, its findings will not be reversed unless its account was implausible based upon the entirety of the record or the reviewing court is left with the 'definite and firm conviction that a mistake has been committed.'" *N.A.A.C.P. v. Fordice*, 252 F.3d 361, 365 (5th Cir. 2001) (quoting *Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143, 1147 (5th Cir. 1993)). This standard "preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law." *Gingles*, 478 U.S. at 79.

## B.

The district court summarized its findings relating to the totality of the circumstances as follows:

> 1. Hattiesburg has a history of official racial discrimination, but all such practices ceased many years ago. This factor weighs slightly in favor of Plaintiffs.

> 2. Voting is highly polarized along racial lines in Hattiesburg. Blacks most often vote for blacks, and whites most often vote for whites. This factor weighs in favor of Plaintiffs.

8

3. There is no evidence that the majority-vote requirement hinders African-American electoral opportunity. This factor weighs in favor of Defendants.

4. Although there exists a substantial socioeconomic disparity between Hattiesburg's African-American citizens and its white ones, it does not hinder African-Americans' voting and participation in the City's political process. This factor weighs in favor of Defendants.

5. There is no evidence of racial appeals in Hattiesburg's city elections. This factor weighs in favor of Defendants.

6. No African-American has ever been elected to the City Council from Wards 1, 3, or 4. However, Hattiesburg's African-American mayor has enjoyed substantial electoral success, and he wields a considerable amount of power in the mayor-council form of municipal government. This factor weighs slightly in favor of Plaintiffs.

7. The evidence overwhelmingly demonstrates that Hattiesburg's elected officials, including its white City Council members, are responsive to the needs of the African-American community. This factor weighs in favor of Defendants.

8. The Council Plan furthers the City's legitimate, non-tenuous interests. This factor weighs in favor of Defendants.

9. The number of districts in which African-Americans form an effective majority is roughly proportional to their share of the City's population, particularly when one considers voting-age population. This factor weighs in favor of Defendants.

The district court ultimately concluded that "Hattiesburg's current ward plan does not practically hinder African-Americans' opportunity to participate in the political process and elect representatives of their choice. The evidence demonstrates that African-Americans in Hattiesburg enjoy political power in

No. 15-60637

rough proportion to their share of the voting-age population, and that they actively exercise such power through the political process."

## C.

## 1.

Plaintiffs maintain that the district court incorrectly relied upon the election of Hattiesburg's African-American mayor to diminish the significance of two of the Senate Factors: the extent to which minority group members have been elected to public office and the extent to which voting is racially polarized. However, we have approved the use of so-called exogenous elections, *see Rodriguez*, 385 F.3d at 860 n.5, although we recognize their limited probative value, *see Clark II*, 88 F.3d at 1397 ("[E]xogenous elections . . . are less probative than elections involving the specific office that is the subject of the litigation."). In accordance with this precedent, the district court acknowledged that the mayoral election was of limited relevance and even discounted the significance of the state and national election data. In light of our acceptance of the limited use of exogenous elections, the district court did not err in relying on the citywide election of an African-American mayor in its findings as to these two Senate Factors.

## 2.

Plaintiffs also take issue with the district court's finding regarding the effects of discrimination on the ability of African Americans to participate in the political process, highlighting the evidence of socioeconomic disparities that was presented at trial. However, "proof of socioeconomic disparities and a history of discrimination 'without more'" does not demonstrate that a group of citizens has less opportunity to participate in the political process. *Clark II*, 88 F.3d at 1399. Indeed, Congress "clearly did not dispense with proof that participation in the political process is in fact depressed among minority citizens." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*

10

(*LULAC v. Clements*), 999 F.2d 831, 867 (5th Cir. 1993) (en banc).  As evidence that participation is depressed, Plaintiffs point to the analysis of their expert, Allan Lichtman, who concluded that "[s]ocio-economic disadvantages make it more difficult for African Americans than whites to find qualified candidates for political office, to fund campaigns, and to must[er] supporters to the polls."

Testimony regarding depressed political participation relevant to a local election must be grounded in a *local* appraisal of the facts.  *See Fordice*, 252 F.3d at 368 (noting that "to support a favorable finding on [whether socioeconomic disparity hampers the ability of minorities to participate], [the plaintiff] bore the burden to demonstrate that the African-American citizens of Mississippi 'do not *in fact* participate to the same extent as other citizens'" (emphasis added) (quoting *LULAC v. Clements*, 999 F.2d at 866)); *see also Clark II*, 88 F.3d at 1399 (rejecting an expert's testimony that "individuals of lower socioeconomic status were not as likely to vote as individuals of higher socioeconomic status" because it was not based on "an intensely local appraisal of the social and political climate").  Lichtman's testimony and report are not evidence that African Americans in Hattiesburg *actually* have depressed political participation, but rather support the theory that socioeconomic disparity can effect political participation generally.  The district court was not required to accept Lichtman's testimony on this point.  *See LULAC v. Clements*, 999 F.2d at 867–68 (concluding that Plaintiffs "ha[d] not established that the effects of past discrimination ha[d] hindered their ability to participate in the political process" where their expert's testimony amounted to "support for the common sense proposition that depressed political participation typically accompanies poverty and a lack of education[] . . . [and was not] proof that

minority voters *in this case* failed to participate equally in the political processes" (emphasis in original)).[3]

### 3.

Plaintiffs also challenge the district court's finding regarding Hattiesburg's responsiveness to the African-American community. According to Plaintiffs, the district court incorrectly relied on the fact that over 90% of the city council votes were unanimous. To Plaintiffs, the relevant consideration is the percentage of divided city council votes that are divided on racial lines. Not only do Plaintiffs cite no authority that the responsiveness factor somehow turns on this metric, but also Plaintiffs fail to address the plethora of evidence supporting the district court's finding that Hattiesburg was responsive.[4] *See Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1118 (5th Cir. 1991) ("A finding of fact is 'clearly erroneous' only when although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (citing *Campos v. City of Baytown*, 840 F.2d 1240, 1243 (5th Cir. 1988))). In fact, we have previously noted that this factor has two facets: "the provisions of municipal services to neighborhoods populated by minority

---

[3] Indeed, the district court noted that the evidence at trial affirmatively demonstrated that "although Hattiesburg's African-American citizens have lower incomes, educational levels, and standards of living than its white citizens, they participate in the political process at the same or higher levels." For example, Hattiesburg's African-American citizens historically registered and voted in greater numbers than its white citizens. African Americans in Hattiesburg also participated in the public hearings about redistricting and the City Council's weekly "Citizens Forum." The district court further noted that African Americans' participation in Hattiesburg's democratic process was "robust."

[4] The district court discussed Chris Watson's testimony that he found no racial disparity in how Hattiesburg funded city services, and that over half of city employees were African American. It further examined two development projects, the relationship between city council and the mayor, and the history of the council's "Citizens Forum." Indeed, the district court examined council voting patterns as just one of seven separate considerations under the responsiveness factor.

group members [and] the distribution of municipal jobs and appointments to various boards and commissions." *David v. Garrison*, 553 F.2d 923, 929 (5th Cir. 1977); *see also Jones v. City of Lubbock*, 727 F.2d 364, 381 (5th Cir. 1984) (examining municipal services, minorities in public employment, and projects of interest to the minority community).  As to both of these facets, the district court found in favor of Hattiesburg.  Finding no error, we will not disrupt the district court's finding as to responsiveness.

4.

Next, Plaintiffs criticize the district court's finding as to tenuousness.  As to this factor, the district court discussed the testimony of councilmembers that the primary goal in redistricting was to correct the deviation in the wards' population with as little change to the ward lines as possible.  It also noted the testimony of Chris Watson that he created the Adopted Plan with the goal of correcting the population deviation and "causing as little change to the existing ward lines as possible, causing as few voters to change voting precincts as possible, maintaining all of the communities of interest, and respecting traditional geographical boundaries."  These goals align with traditional districting principles.  *See Chen v. City of Houston*, 206 F.3d 502, 512 (5th Cir. 2000); *see also Evenwel v. Abbott*, 136 S. Ct. 1120, 1124 (2016) ("[W]hen drawing state and local legislative districts, jurisdictions are permitted to deviate somewhat from perfect population equality to accommodate traditional districting objectives, among them, preserving the integrity of political subdivisions, maintaining communities of interest, and creating geographic compactness.").  Plaintiffs have failed to establish how this finding was clearly erroneous.

5.

The focus of Plaintiffs' appeal concerns the district court's treatment of rough proportionality.  The district court ultimately found that "[t]he number

of districts in which African-Americans form an effective majority is roughly proportional to their share of the City's population, particularly when one considers voting-age population. This factor weighs in favor of Defendants." In making this finding, the district court noted that, on the facts of the case:

> Strict proportionality is impossible. Regardless of the result, one side of this dispute will get forty percent of the voting power (2 out of 5 Council positions), while the other will get sixty percent (3 out of 5). With the current population numbers, there is no way to apportion five seats and achieve strict proportionality. There will necessarily be an imbalance in one direction or the other.

Among other arguments, Plaintiffs contend the district court failed to consider the possibility of a plan that contained a competitive (or "swing") third ward.

The Supreme Court has noted that "'[p]roportionality' as the term is used [in the totality of circumstances analysis] links the number of majority-minority voting districts to minority members' share of the relevant population."[5] *De Grandy*, 512 U.S. at 1014 n.11. The proportionality analysis discussed by the Supreme Court in *De Grandy* utilized voting-age population, but the Supreme Court has declined to endorse the use of voting-age population over total population or vice-versa. *See id.* at 1014, 1017 n.14. In accordance with this authority, we have determined that a district court's use of voting-age population is not clearly erroneous. *Fairley I*, 584 F.3d at 674; *see also African Am. Voting Rights Legal Def. Fund, Inc. v. Villa*, 54 F.3d 1345, 1352–53 (8th Cir. 1995). Furthermore, the Supreme Court has cautioned that there

---

[5] Notably, the Court distinguished proportionality as a factor to be considered in the totality of the circumstances analysis "from the subject of the proportional representation clause of § 2, which provides that 'nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.'" *De Grandy*, 512 U.S. at 1014 n.11 (quoting 52 U.S.C. § 10301(b)). "[I]t is important to keep the concepts of 'proportionality' and 'proportional representation' distinct." *Solomon v. Liberty Cty. Comm'rs*, 221 F.3d 1218, 1224 n.5 (11th Cir. 2000).

is no "magic parameter" and that proportionality "must allow for some deviations." *LULAC v. Perry*, 548 U.S. at 438; *see also De Grandy*, 512 U.S. at 1017 n.14. Indeed, if a city drew district lines with the predominant purpose of achieving strict racial proportionality, the city would have to defend the resulting districts under a strict scrutiny analysis. *See Miller v. Johnson*, 515 U.S. 900, 915–16 (1995); *see also Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1267 (2015) ("[A] policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote) provides evidence that race motivated the drawing of particular lines in multiple districts in the State."); *Bush v. Vera*, 517 U.S. 952, 986 (1996) (plurality opinion) (affirming a district court's decision declaring Texas's congressional redistricting effort unconstitutional because of racial gerrymandering to create a majority Hispanic district and majority African-American districts); *Miller*, 515 U.S. at 927–28 ("It takes a shortsighted and unauthorized view of the Voting Rights Act to invoke that statute, which has played a decisive role in redressing some of our worst forms of discrimination, to demand the very racial stereotyping the Fourteenth Amendment forbids."). "In the end, 'substantial proportionality' is what matters in the totality-of-circumstances analysis." *Fairley I*, 584 F.3d at 674 (citing *De Grandy*, 512 U.S. at 1015–16).

Finally, we reject Plaintiffs' argument that the district court treated rough proportionality as a safe harbor in contravention of *LULAC v. Perry*, 548 U.S. at 436. Although the district court gave proportionality great weight, it also gave significant weight to the fact that African Americans in Hattiesburg participate in the political process. According to the language of the district court's 46-page opinion, proportionality was not, in and of itself, dispositive. *See Villa*, 54 F.3d at 1356 ("Although the district court's opinion focuses heavily upon proportionality, it addresses the various other factors."). Moreover, in

No. 15-60637

accordance with the clear error standard, we will not reweigh the evidence. *Fordice*, 252 F.3d at 365.

With these principles and considerations in mind, we cannot say that the district court's finding regarding rough proportionality was clearly erroneous or the result of legal error. Rather, the district court properly took into consideration the local situation in Hattiesburg, including the existence of only five wards and the voting-age population of the city. Although we might have reached a different conclusion based on the evidence, that is not the appropriate test on appeal. *See Price*, 945 F.2d at 1312.

## IV.

The district court fulfilled its role in conducting an intensely local appraisal of the facts. It did not commit reversible error, so we AFFIRM.

16

No. 15-60637

CARL E. STEWART, Chief Judge, dissenting:

Unlike most § 2 appeals, this case does not turn on the district court's factual determinations, as the facts are virtually undisputed. Rather, this case concerns the trial court's application of precedent in its pivotal "totality of the circumstances" analysis. Thus, my departure from the panel majority is based not on the district court's factual determinations but rather the manner in which the court applied the controlling legal standards to these facts. The majority opinion affirms the district court's judgment based on its factual findings and determines that the court's totality of the circumstances analysis was legally tenable. Because I am convinced a deeper analysis is required and that, under such an analysis, Hattiesburg's electoral scheme violates the Voting Rights Act, I respectfully dissent.

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). The totality of the circumstances test is a functional appraisal of whether "minorities have been denied an 'equal opportunity' to participate in the political process and to elect representatives of their choice." *Abrams v. Johnson*, 521 U.S. 74, 91 (1997) (quoting 42 U.S.C. § 1973(b)). "The need for such 'totality' review springs from the demonstrated ingenuity of state and local governments in hobbling minority voting power, a point recognized by Congress when it amended the statute in 1982." *Johnson v. De Grandy*, 512 U.S. 997, 1018 (1994) (internal citations omitted).

Although district courts are afforded considerable discretion in weighing the totality of the circumstances so that they may conduct "an intensely local appraisal of the design and the impact of the contested electoral mechanisms,"

17

*Gingles*, 478 U.S. at 79 (quotation omitted), U.S. Supreme Court and Fifth Circuit precedent has established certain base principles. First, we follow *Clark v. Calhoun Cty. (Clark I)*'s lodestar rule that "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances." 21 F.3d 92, 97 (5th Cir. 1994) (citation omitted); *see also NAACP v. Fordice*, 252 F.3d 361, 374 (5th Cir. 2001); *Teague v. Attala Cty.*, 92 F.3d 283, 293 (5th Cir. 1996). "In such cases, the district court must explain with particularity" why it has reached such a conclusion. *Clark I*, 21 F.3d at 97 (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)). Second, courts have held that the most important Senate Factors are "the extent to which minority group members have been elected to public office in the jurisdiction" and the "extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles*, 478 U.S. at 48 n.15. Third, exogenous elections "are less probative than elections involving the specific office that is the subject of litigation." *Clark v. Calhoun Cty. (Clark II)*, 88 F.3d 1393, 1397 (5th Cir. 1996). And, fourth, "[p]roportionality is not a safe harbor," and its presence does not "prove the absence of dilution." *De Grandy*, 512 U.S. at 1026 (O'Connor, J., concurring).

Here, both parties stipulated that the *Gingles* preconditions had been met. Thus, the district court should have started its inquiry from the established benchmark that a § 2 violation had occurred and then "explain[ed] with particularity" why this was the "very unusual" case where the plaintiffs failed to demonstrate a violation under the totality of the circumstances results test. *See Clark I*, 21 F.3d at 97. Instead, the district court inverted the analysis: it enunciated the *Clark I* rule, disregarded it, and proceeded directly

18

to the results test, placing the burden on the plaintiffs to establish that the factual evidence amounted to a § 2 violation. This was legal error.

Moreover, there is insufficient probative evidence in the record to justify a deviation from the *Clark I* benchmark; thus, the district court's conclusion that no § 2 violation existed despite the presence of all three *Gingles* preconditions—a determination courts have made in only a handful of cases nationwide—was also erroneous. The few courts that have found no § 2 violation despite the fact that the *Gingles* factors were satisfied or assumed did so where, for example, the record did not demonstrate "a history of persistent discrimination reflected in the larger society" or that "bloc-voting behavior portend[ed] any dilutive effect." *See NAACP v. City of Niagara Falls*, 65 F.3d 1002, 1023 (2d Cir. 1995). Courts have similarly found no § 2 violation where the adopted system arguably increased the opportunity for minority voters to elect representatives of their choice or where minority voters had achieved proportional representation within that system. *See Jenkins v. Manning*, 116 F.3d 685, 692, 696 (3d Cir. 1997); *Niagara Falls*, 65 F.3d at 1022; *Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist. #1*, 56 F.3d 904, 911–12 (8th Cir. 1995). The Fifth Circuit determined that a case was the "very unusual" exception where only one, non-predominant Senate Factor weighed in favor of the plaintiffs, and all other factors weighed in favor of the defendants. *See Fordice*, 252 F.3d at 374.[1]

---

[1] In *Fordice*, this court stated: "We find that the district court met th[e] requirement [to explain with particularity why it concluded that the contested electoral districts did not violate § 2] . . . . In summary, the district court found that, although Mississippi has an undeniable history of official discrimination . . . [the plaintiffs] failed to demonstrate that this reality hindered the ability of Mississippi's African-American citizens to participate effectively in the state's political process." *Fordice*, 252 F.3d at 374.

No. 15-60637

None of these situations is present here. Rather, the district court found, *inter alia*, that Hattiesburg "has a long, well-established history of official discrimination against African-Americans for the purpose of limiting their participation in the democratic process"; that no black candidate has ever been elected to the Hattiesburg City Council from a majority-white district; and that, despite black citizens comprising over fifty percent of Hattiesburg's population, black candidates have never secured more than two seats on the five-seat City Council. Additionally, here—unlike in any of the previously cited cases—*both* predominant Senate Factors weighed in favor of the plaintiffs. Thus, the district court's judgment, if sustained by the panel majority, will be the outlier case where no § 2 violation exists even though the three *Gingles* preconditions were indisputably satisfied and the court determined (1) that voting was highly racially polarized and (2) that members of the minority group struggled to be elected to public office in the jurisdiction.[2]

Yet, the district court never explained, with the requisite particularity or otherwise, how it reached this exceptional result. *See Clark I*, 21 F.3d at 97 (citation omitted). Instead, after determining that the *Gingles* preconditions were satisfied and three of the Senate Factors—including the two predominant factors—weighed in the plaintiffs' favor, the district court summarized its conclusion as follows:

> After spending a great deal of time considering the evidence, the Court concludes that Hattiesburg's current ward plan does not practically hinder African-Americans' opportunity to participate in the political process and elect representatives of their choice. The evidence demonstrates that African-Americans in Hattiesburg

---

[2] The Supreme Court identified these Senate Factors as the "most important" in order to "effectuate[] the intent of Congress." *See Gingles*, 478 U.S. at 48 n.15. Diminishing the importance of these key factors without a well-grounded reason therefore runs afoul of § 2 and its intended purpose.

enjoy political power in rough proportion to their share of the voting-age population, and that they actively exercise such power through the political process.

For these reasons, the Court finds that Hattiesburg, Mississippi's current ward plan does not dilute the voting or political power of African-American citizens in violation of Section 2 of the Voting Rights Act.

Although the record is unclear as to how much weight the district court assigned it, the language of the district court's opinion strongly evinces that the repeated success of black mayor Johnny Dupree in exogenous mayoral elections was an essential, if not dispositive, consideration in the court's determination that no § 2 violation existed. For example, in assessing the extent to which minority group members have been elected to public office in the jurisdiction—one of the predominant Senate Factors—the district court "note[d] that, as mayor, Dupree wields considerable power."[3] Thus, although the fact that no black candidate had ever been elected to the City Council from Wards 1, 3, or 4 "tilt[ed] this factor in Plaintiffs' favor," the court ultimately concluded that "that fact is mitigated by Mayor Dupree's success in citywide

---

[3] The court explained, for instance, that Mayor Dupree "enjoys superintending control of all the offices and affairs of the municipality," "supervise[s] all of the departments of the municipal government," must approve any ordinance passed by the City Council (although the City Council can  override his veto with a two-thirds vote), and "may attend meetings of the council and take part in [its] discussions" (internal quotation marks omitted).

However, it is also clear that Mayor Dupree's power is limited and that Hattiesburg's electoral scheme has thwarted the interests of the black community on matters of vital importance. Although the district court noted that between October 2011 and September 2014, 91.2% of the City Council's votes were unanimous, black councilmembers have been unable to prevail on issues of particular concern to the black community. For example, votes on the adoption of the redistricting plan currently in dispute and a proposed property tax increase to meet the school board's funding request (over 90% of the students in the Hattiesburg Public School District are black) broke down along racial lines, with the result that black councilmembers were outvoted.

elections."[4]    Additionally, in analyzing the extent of racial polarization in Hattiesburg—the other key Senate Factor—the district court stated that it "[did] not accept Plaintiffs' argument that voters are polarized at the 'mathematical maximum' level," because a black candidate had won the 2013 citywide mayoral election.  Further, despite its disclaimer to the contrary, the district court considered the exogenous mayoral elections in concluding that the effects of Mississippi's past discrimination do not hinder black citizens' ability to participate in the political process today.  According to the district court, black citizens' ability to elect a black mayor in four consecutive citywide elections provides "evidence of African-Americans' robust participation in Hattiesburg's democratic process."  This comparison, however, is inapposite.

Although the district court was permitted by precedent to consider the results of the exogenous mayor election in its analysis, the court was not permitted to use these results to fatally diminish the impact of the predominant Senate Factors or otherwise tilt the balance in favor of the defendants where the court articulated no other compelling reason for finding that no § 2 violation existed.  *See Clark II*, 88 F.3d at 1397 (exogenous elections "are less probative than elections involving the specific office that is the subject of litigation").  Thus, the district court's reliance on Mayor Dupree's electoral success throughout its totality of the circumstances analysis was improper and legally erroneous.

---

[4] Although the district court focused on Mayor Dupree's "considerable power" in its analysis of this Senate Factor, the court cites no authority—nor does any appear to exist— that such a consideration is part of the inquiry into "the extent to which minority group members have been elected to public office in the jurisdiction."  *See Gingles*, 478 U.S. at 48 n.15.

No. 15-60637

The language of the district court's opinion also evinces that its finding that the number of majority-black districts is "roughly proportional" to black citizens' share of the voting-age population may have impermissibly affected the outcome of the court's analysis. Not only is proportionality "not a safe harbor," *see De Grandy*, 512 U.S. at 1026 (O'Connor, J., concurring) ("[p]roportionality is not a safe harbor," and its presence does not "prove the absence of dilution"), but the court's proportionality analysis itself was flawed. The district court determined that black citizens, who comprise 53.04% of Hattiesburg's total population and 47.95% of its voting-age population but have 40% representation on the City Council, enjoyed electoral success that was "roughly proportional" to their share of the population.[5] The court stated that because "[s]trict proportionality is impossible," there would "necessarily be an imbalance in one direction or the other." It explained that it "need not reject one roughly proportional plan because there exists another which may be slightly more roughly proportional" and asserted that the plaintiffs were seeking to "maximize African-American electoral opportunity." For this reason, the district court determined that the proportionality factor weighed in favor of the defendants.

However, the court failed to consider that the City Council was not limited to creating either three majority-black and two majority-white wards or three majority-white and two majority-black wards. Rather, the City Council was also presented with the option of creating two majority-black wards, two majority-white wards, and one equal opportunity swing ward. This option would also have been more proportional than the plan ultimately

---

[5] By contrast, white citizens make up 40.48% of Hattiesburg's total population and 45.98% of its voting-age population but have 60% representation on the City Council.

adopted by the city. While the district court may be correct that Hattiesburg was not legally required to choose the most proportional plan, that the court gave the proportionality factor, at minimum, a significant role in its totality of the circumstances analysis where the city chose the *least* proportional plan out of several available options was anomalous at best and legally incorrect at worst.

Thus, although the district court did not explain on what basis it determined that the totality of the circumstances outweighed the satisfaction of the *Gingles* factors and the predominant Senate Factors, that the results of the exogenous mayoral election shifted the balance in favor of the defendants cannot be the reason for this conclusion. *See Clark II*, 88 F.3d at 1397. Nor can the court's finding of "rough" proportionality have changed the outcome of the analysis. *See De Grandy*, 512 U.S. at 1026 (O'Connor, J., concurring). Either of these rationales would be legally impermissible. Absent any other explanation for why the district court strayed from the *Clark I* benchmark, we are left with the strong probability that the district court misapplied the legal standards.

In my view, the district court's decision unnecessarily weakens *Clark I*'s benchmark guidance that "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances." *Clark I*, 21 F.3d at 97 (citation omitted). If no § 2 violation exists where the *Gingles* preconditions were indisputably met; both predominant Senate Factors were satisfied; and the trial court acknowledged that the municipality has a long, extensive history of purposeful discrimination against black voters to limit their participation in the political process, that no black City Council candidate has ever been elected from a majority-white ward, and that black

citizens have never achieved proportional representation under the current electoral scheme, virtually no case will ever exist where a § 2 violation is found in this context.  For this reason, I respectfully dissent.